**1448**

IN RE NBW COMMERCIAL
PAPER LITIGATION.

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, in its capacity as receiver
of the National Bank of Washington,
Defendant.

No. 90–1755 (RCL), Civ. A.
No. 91–0626 (RCL).

United States District Court,
District of Columbia.

March 11, 1992.

William F. Sheehan, William R. Galeota, Christopher E. Palmer, Shea & Gardner, Washington, D.C., for AFSCME (C.A. 91–0626), Bafton Corp., et al. (C.A. 91–1838), Colson Servs. Corp. (C.A. 91–1839).

Michael Evan Jaffe, Howard B. Possick, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for George Hyman Constr. Co., et al. (C.A. 90–1297).

Richard O. Duvall, Stephen A. Bogorad, Charles M. Steele, Dunnells, Duvall & Porter, Washington, D.C., for Kaempfer Co., et al. (C.A. 90–1696), Brent Scowcroft (C.A. 91–0996), Thomas Dodd (C.A. 90–1875), Clarendon Square Associates, et al. (C.A. 90–1874).

F. Joseph Nealon, Amy Sanborn Owen, Marianne P. Eby, Ballard, Spahr, Andrews & Ingersoll, Washington, D.C., for Intern. Ass'n of Machinists and Aerospace Workers (C.A. 90–1822).

John H. Harman, William N. Coggins, Silver Spring, Md., for Columbia Real Estate Title Ins. Co. (C.A. 90–1702).

Thomas W. Queen, Joseph L. Ruby, Wiley, Rein & Fielding, Washington, D.C., for Telemet America, Inc. (C.A. 90–1753).

Susan G. Braden, Anderson Kill Olick & Oshinsky, Washington, D.C., for Sherman R. Smoot Corp. (C.A. 90–1795).

Aaron Handleman, Jeffrey J. Hines, Eccleston & Wolf, Washington, D.C., for World Plan Executive Council, et al. (C.A. 90–1841), Ward Corp., et al. (C.A. 90–1810).

David J. Frantz, Walter G. Birkel, Conlon, Frantz, Phelan, Kanpp, Pires & Birkel, Washington, D.C., for National Theater Corp., et al. (C.A. 90–1837).

Philip M. Musolino, Loewinger, Brand & Kappstatter, Washington, D.C., for Bresler & Reiner, Inc., et al. (C.A. 90–3017).

John B. Connor, Leslie M. Alden, Verner, Liipfert, Bernhard, McPherson & Hand, McLean, Va., for Richard Barber Associates Inc. (C.A. 90–3089).

Charles Lee Eisen, Christopher M. McMurray, Kirkpatrick & Lockhart, Washington, D.C., for Clinton Co., et al. (C.A. 91–0997), Route 35 Shrewsbury Ltd. Part., et al. (C.A. 90–1766).

Craig C. Reilly, Murphy, McGettigan & West, P.A., Alexandria, Va., for T.J.B., Inc. (C.A. 91–1704).

George A. Fisher, Washington, D.C., for Jacob A. Stein, et al. (C.A. 91–1706).

William L. Martin, Ellen D'Alelio, Steptoe & Johnson, Washington, D.C., for FDIC (all cases except C.A. 90–1297).

Ronald J. Jessamy, Jessamy, Fort & Botts, Washington, D.C., for FDIC (in C.A. 90–1297 only).

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case is one of the 43 consolidated cases that comprise the litigation captioned *In re NBW Commercial Paper Litigation,* Master File No. 90–1755. In a status call attended by attorneys from virtually every law firm in the District of Columbia, all counsel agreed to use the action brought by the American Federation of State, County, and Municipal Employees ("AFSCME") as a test case for plaintiffs' claims against the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for the National Bank of Washington ("NBW").[1] By agreement of all counsel, the defendant, the FDIC, in its capacity as receiver of NBW, filed two motions to dismiss. The first motion, if granted, would eliminate all of AFSCME's claims and spell doom for the vast majority of claims in the other 20 cases against the FDIC, which are substantially identical to this one.[2] The second motion, if granted, would result in the dismissal of all other claims, including those raised by other plaintiffs, but not by AFSCME.[3] Because both motions involve similar issues regarding the commonlaw *D'Oench* doctrine and certain sections of FIRREA which may create an absolute defense from liability for the FDIC, much of the court's initial discussion of the law will apply to both motions.

## I. The Facts

All 43 cases arise from the failure of the National Bank of Washington ("NBW"). For the purposes of this motion, the court must accept the plaintiffs' rendition of the facts; the facts in most of the cases are not substantially in dispute.[4] Washington Bancorpo-

---

1. Most of the plaintiffs have filed two separate actions, one seeking relief from the FDIC as receiver for NBW and the other seeking damages against various former officers and directors of NBW. These motions, and particularly the second motion to dismiss, concern the following actions: *George Hyman Constr. Co. v. FDIC,* C.A. No. 90–1297; *Kaempfer Co v. FDIC,* C.A. No. 90–1696; *Columbia Real Estate Title Ins. Co. v. FDIC,* C.A. No. 90–1702; *Telemet America, Inc. v. FDIC,* C.A. 90–1753; *Route 35 Shrewsbury v. FDIC,* C.A. No. 90–1766; *Sherman R. Smoot Corp. v. FDIC,* C.A. No. 90–1795; *Ward Corp. v. FDIC,* C.A. No. 90–1810; *International Ass'n of Machinists & Aerospace Workers v. FDIC,* C.A. No. 90–1822; *National Theatre Corp. v. FDIC,* C.A. No. 90–1837; *World Plan Executive Council v. FDIC,* C.A. No. 90–1841; *Clarendon Square Assocs. v. FDIC,* C.A. No. 90–1874; *Thomas Dodd v. FDIC,* C.A. No. 90–1875; *Bresler & Reiner v. FDIC,* C.A. No. 90–3017; *Richard J. Barber Assocs. v. FDIC,* C.A. No. 90–3089; *Scowcroft v. FDIC,* C.A. No. 91–0996; *Clinton & Co. v. FDIC,* C.A. No. 91–0997; *T.J.B., Inc. v. FDIC,* C.A. No. 91–1704; *Stein v. FDIC,* C.A. No. 91–1706; *Bafton Corp. v. FDIC,* C.A. No. 91–1838; *Colson Servs. Corp. v. FDIC,* C.A. No. 91–1839.

2. Although the court will focus on AFSCME's claims with respect to the first motion to dismiss, all of the analysis below is relevant to the identical claims made by the other plaintiffs. The FDIC's second motion to dismiss directly relates to the claims of the other plaintiffs.

3. A few claims by various plaintiffs are treated in neither motion to dismiss. These include Count V (unauthorized disclosure of confidential financial information) in *Columbia Real Estate Title Ins. Co. v. FDIC,* Civ. No. 90–1702; Count XIII (declaratory judgment that promissory note was executed under undue pressure and duress) and Count X (breach of contract for failure to purchase WBC commercial paper) in *Kaempfer Co. v. FDIC,* Civ. No. 90–1696; Count VII (breach of contract for failure to purchase WBC commercial paper) in *National Theater Corp. v. FDIC,* Civ. No. 90–1837.

4. The court culled these facts from AFSCME's complaint and from AFSCME's motion for summary judgment on Count I of the complaint (violation of § 12(1) of the Securities Act of 1933). This motion was withdrawn by agreement of the parties so that the court could resolve the legal issues raised by the FDIC's motions to dismiss.

ration ("WBC")[5], the holding company which owned NBW, decided to issue commercial paper in July of 1984. NBW served as the exclusive agent of WBC for the purposes of marketing this commercial paper. To support this program, WBC obtained backup lines of credit from various major banks. In 1989, these banks included Marine Midland Bank, Chase Manhattan Bank, Manufacturers Hanover Bank, and Bank of New York. These backup lines of credit were crucial to the commercial paper program because WBC's debt covenants with Mutual Life Insurance Company of New York required WBC to maintain supporting lines of credit that accounted for 50% of its outstanding commercial paper; in addition, the Federal Reserve Bank of Richmond advised WBC that Federal Reserve guidelines also required supporting lines of credit equal to 50% of the outstanding commercial paper.

All of the plaintiffs in the consolidated cases, including AFSCME, were customers of NBW. All of these companies and individuals invested funds through NBW, most on an overnight basis. All claim to have preferred a low-risk approach to investment and to have communicated this preference to the appropriate officials at NBW. A recitation of the facts of AFSCME's particular case is sufficient to explain generally the events which support all of the plaintiffs' claims. Under a Master Repurchase Agreement, NBW agreed to invest AFSCME's funds in appropriate financial instruments and then to repurchase these financial instruments the following day. AFSCME invested solely in U.S. Treasury Notes and other U.S. government obligations until early 1988, when NBW offered to sell AFSCME commercial paper on an overnight basis. AFSCME alleges that officers of NBW told them that WBC commercial paper was as safe an investment as the government securities which AFSCME had previously been purchasing. Further, AFSCME claims that at no time were they aware that the commercial paper which they were purchasing was issued by WBC, the parent corporation of NBW.

By 1990, WBC and NBW found themselves in extreme financial difficulty. Because of the financial instability of NBW, the four banks which provided the backup lines of credit supporting WBC commercial paper cancelled their lines of credit in early April of 1990; no other banks could be found to provide alternate lines of credit. At this time, WBC and NBW lacked the cash flow to pay off the vast majority of the $45 million dollars in commercial paper that was outstanding. Because, however, investors, such as AFSCME and the other plaintiffs, continued to roll over their money from one overnight investment to another, NBW was not initially faced with the prospect that it would have to default on the commercial paper. AFSCME alleges that NBW did not inform any of the plaintiffs of the failure of its lines of credit (or of the bank's precarious financial position) and that the bank continued to invest their funds in WBC commercial paper. On May 2, 1990, representatives of the Federal Reserve and the Office of the Comptroller of the Currency met with NBW directors to warn them that the further issuance of commercial paper was an unsound practice. On Friday, May 4, 1990, NBW invested $1,800,-000 of AFSCME's money in WBC commercial paper that was to mature on Monday, May 7, 1990. On May 7, 1990, WBC announced that it was defaulting on the $25,-800,000 of commercial paper that was to mature on that day; the bank also defaulted on $10,900,000 of commercial paper which matured subsequently. WBC filed for Chapter 11 bankruptcy on August 1, 1990, and, on August 10, 1990, the Comptroller of the Currency closed NBW and appointed the FDIC as receiver.

## II. Procedural History

Following the procedures set out in the Financial Institutions Return, Recovery, and Enforcement Act of 1989 ("FIRREA"), AFSCME filed an administrative claim with the FDIC, as receiver for NBW, demanding the return of the $1.8 million which they had invested in commercial paper. The FDIC rejected this claim within the 180 days allot-

---

**5.** WBC did not have its own officers or directors. Rather, employees of NBW performed any tasks which WBC required.

ted by the statute. The FDIC's notice to AFSCME stated:[6]

> After review of AFSCME's claim, the FDIC has determined that AFSCME's claim is totally disallowed. The claimant has not proven its claim to the satisfaction of the receiver based on applicable principles of common and statutory law, including *D'Oench, Duhme and Co. v. FDIC,* 315 U.S. 447 [62 S.Ct. 676, 86 L.Ed. 956] (1942), 12 U.S.C. §§ 1821(d)(9), 1823(e) and governing principles applicable to the awards of punitive damages against the FDIC. Letter from FDIC to AFSCME (Feb. 13, 1991).

Having exhausted their administrative remedy as required by law, AFSCME filed suit in this court on March 6, 1991, alleging violations of federal securities laws (both the Securities Act of 1933 and the Securities Exchange Act of 1934), various common law claims, and violations of the District of Columbia's Blue Sky laws. Most of the other plaintiffs have filed similar actions, though some raise claims which AFSCME has not. Also consolidated in this action (for pretrial purposes only) are the plaintiffs' related actions against various individual directors of NBW.[7] The individual directors have no direct involvement in this motion because they cannot raise the statutory and common law defenses peculiar to the FDIC when it assumes the responsibilities of a failed bank.

Thanks to the efforts of counsel for AFSCME and the FDIC, all parties agreed on October 3, 1991, to stay the consolidated actions pending the court's resolution of the FDIC's motion to dismiss the AFSCME complaint and its motion to dismiss or strike the remaining claims. The parties and the court agreed that resolution of these particular defenses was crucial to the possibility of a negotiated solution. All of the plaintiffs have had an opportunity to respond to these motions, both in writing and orally. The court held oral argument on January 28, 1992, and has attempted to resolve these difficult issues as promptly as possible.

### III. The History of the D'Oench doctrine and its Statutory Counterparts

The FDIC does not at this time deny any of the allegations made by the various plaintiffs. Rather, the FDIC argues that it "stands in a different position" than the failed bank and the individual defendants. *Jackson v. Brown–Knox & Assocs.,* No. 88–2273, slip op. at 16 (C.D.Ill. Sept. 5, 1990). The FDIC argues that it can even admit fraudulent conduct on the part of NBW, yet still assert, as complete defenses to plaintiffs' claims, the protection afforded to the FDIC by the common-law *D'Oench* doctrine and two statutory provisions of FIRREA. To fully analyze this rather arcane area of the law, the court must first digress with a substantial amount of background material.

### A. The D'Oench Doctrine

The genesis of the doctrines at issue in this case occurred in 1942 in the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[8] In *D'Oench,* the FDIC sought to enforce a note which it had acquired in a purchase and assumption transaction with a failed bank. The maker of the note raised as a defense an oral agreement with the bank that the note would never actually be called for payment. *See id.* at 456, 62 S.Ct. at 679. The Supreme Court held that this defense was invalid against the FDIC because of the "federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks

---

**6.** The other plaintiffs all received substantially identical notices.

**7.** Other cases related to this action which are currently before this court include: a proposed class action by purchasers of WBC common stock, *see Shields v. Washington Bancorporation,* C.A. No. 90–1101; a suit by NBW and WBC against individuals who allegedly attempted to illegally seize control over the bank, *see Washington Bancorporation v. Said,* C.A. No. 88–3111; an action against various officers and directors of NBW for violations of federal securities laws, *see SEC v. Coleman,* C.A. No. 91–2526; and three suits by officers and directors of NBW seeking attorneys' fees from the FDIC as receiver for NBW, *see Pollard v. FDIC,* C.A. No. 91–1802; *Toups v. FDIC,* C.A. No. 91–2187; *Binder v. FDIC,* C.A. No. 91–2364.

**8.** The phonetic spelling of *D'Oench* is simply "dench."

which [the FDIC] insures." *Id.* at 457, 62 S.Ct. at 679. Federal banking regulators must be able to rely on the records of the banks that the FDIC insures so that they will be able to assess accurately a bank's solvency. *See id.* at 460, 62 S.Ct. at 680–81. While *D'Oench* did not set out a specific test to identify cases where application of this doctrine would be appropriate, the Court did note that "[i]t would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 681.[9]

*D'Oench* has evolved substantially over the past forty years, applying to situations somewhat different from the facts of the original case.[10] One court has called *D'Oench* "expansive and perhaps startling in its severity." *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990). Although the Supreme Court has never relied on the *D'Oench* doctrine directly in any case since 1942, lower courts have held that *D'Oench* applies to oral promises to make a loan, *see Timberland Design Inc. v. First Service Bank,* 932 F.2d 46 (1st Cir. 1991); *Bowen v. FDIC,* 915 F.2d 1013 (5th Cir.1990); *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank,* 749 F.Supp. 635 (D.N.J. 1990); oral contracts to repurchase loans, *see First State Bank v. City & County Bank,* 872 F.2d 707 (6th Cir.1989); fraudulent inducement of another bank into a loan participation agreement, *see FDIC v. Texarkana Nat. Bank,* 874 F.2d 264 (5th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091 (N.D.Tex.1990); fraudulent misrepresentations regarding property or securities sold by the lending bank, *see Fair v. NCNB Texas Nat. Bank,* 733 F.Supp. 1099 (N.D.Tex.1990); *Jackson v. Brown–Knox & Assocs.,* No. 88–2273 (C.D.Ill. Sept. 5, 1990); and oral representations that checks initially dishonored would be honored, *see Carico v. First Nat. Bank of Bogata,* 734 F.Supp. 768 (E.D.Tex.1990). *D'Oench* was also expanded to apply to cases where the FDIC is acting in its capacity as receiver, and not simply to cases where the FDIC, in its corporate capacity, is affirmatively seeking to recover.[11] *See Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway,* 894 F.2d 750, 753 (5th Cir.1990), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203; *Beighley v. FDIC,* 868 F.2d 776, 783 (5th Cir.1989). In addition, most courts, though not all, have refused to permit plaintiffs to recast their claims as torts or violations of federal securities laws. *See FDIC v. State Bank of Virden,* 893 F.2d 139 (7th Cir.1990) (stating that *D'Oench* and § 1823(e) apply to torts or any claim based on an unwritten agreement); *Kilpatrick v. Riddle,* 907 F.2d 1523, 1529 (5th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991) (holding that *D'Oench* bars borrowers' securities law claims); *but see Astrup v. Midwest Fed. Sav. Bank,* 886 F.2d 1057, 1059–60 (8th Cir.1989) (holding that suits that sound in tort are not barred by *D'Oench* ); *Central Nat. Bank v. FDIC,* 771 F.Supp. 161 (E.D.La.1991) (same). In these cases, the courts have refused to distinguish on the grounds of technical differences in pleading when the allegations actually center around an oral agreement and an arrangement which would tend to mislead bank examiners.

---

9. The court in *D'Oench* noted that loans which would never be called for payment would effectively pad the bank's portfolio of assets, thereby making the bank appear more solvent than it actually was. *See id.* at 460, 62 S.Ct. at 680–81.

10. Courts have often stated that the result of *D'Oench* is to create "quasi-holder-in-due-course" status for the FDIC. *See Agri Export Cooperative v. Universal Sav. Ass'n,* 767 F.Supp. 824, 831 (S.D.Tex.1991).

11. This expansion of *D'Oench* was necessary because § 1823(e), as originally enacted in 1950, applied only to FDIC-corporate. The evolution of *D'Oench* responded to the attempts by debtors to bring affirmative suits against FDIC-receiver to avoid the requirements of § 1823(e). Courts also have applied *D'Oench* to cases which involve other government agencies and institutions with a mission similar to that of FDIC—FSLIC and bridge banks. *See FSLIC v. Two Rivers Assoc., Inc.,* 880 F.2d 1267, 1277 (11th Cir.1989) (applying *D'Oench* to FSLIC); *Kilpatrick v. Riddle,* 907 F.2d 1523, 1528 (5th Cir.1990) (applying *D'Oench* to bridge banks). FIRREA expressly expands the protections of § 1823(e) to both FDIC-receiver and these other institutions.

Nonetheless, the paradigmatic application of the *D'Oench* doctrine remains in the lender-borrower context; the vast majority of cases interpreting the doctrine have involved, despite the complexity of the transaction or the procedural posture of the case, individuals or entities who owed money to the bank and who sought to avoid payment of their notes by asserting an oral side agreement. The FDIC forcefully argues that *D'Oench* has regularly been applied outside the lender-borrower context; plaintiff AFSCME rejects this characterization and seeks to explain the recent expansion of *D'Oench* as refinements within the lender-borrower context or, quite simply, as mistakes. No interpretation of *D'Oench*, however, would be proper without first considering the statutory regime which fosters the same policies that generated *D'Oench*.

### B. 12 U.S.C. § 1823(e)

In 1950, Congress passed 12 U.S.C. § 1823(e) which barred certain claims against the FDIC which did not meet the statute's stringent writing requirements. Under its original terms, the provision applied only to FDIC in its corporate capacity; FIRREA, however, amended § 1823(e) to apply additionally to the FDIC in its capacity as receiver of a failed bank. § 1823(e) currently reads as follows:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution. 12 U.S.C. § 1823(e) (1988).

The writing requirements set forth in subsections (1)–(4) have been strictly adhered to by courts that have considered them. Parties who have piecemeal supporting documentation or who allege that a series of documents would satisfy the writing requirement have generally been denied relief. *See FSLIC v. Gemini Management*, 921 F.2d 241, 245 (9th Cir.1990); *Beighley v. FDIC*, 868 F.2d 776, 782 (5th Cir.1989). In some cases, parties adverse to the FDIC have been denied discovery that they have alleged would demonstrate the fulfillment of the writing requirements. *See FSLIC v. Cribbs*, 918 F.2d 557, 560 (5th Cir.1990); *FDIC v. Virginia Crossings Partnership*, 909 F.2d 306, 309–10 (8th Cir.1990).

Since *D'Oench* and the enactment of § 1823(e), the Supreme Court has had occasion to consider this area of law only once. In *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the purchaser of a piece of property sought to avoid payment on his note on the ground that the failed bank had procured the note by misrepresentations concerning the characteristics of the land. The Supreme Court discussed *D'Oench* as a precursor of § 1823(e) and held that the term "agreement" in § 1823(e) should be interpreted broadly to encompass conditions on performance. *See id.* at 92–93, 108 S.Ct. at 401–02. According to the Court, petitioner was, in essence, seeking to enforce an oral warranty on the property through an action for fraud. The Court held that § 1823(e) barred such claims and opened the door for an expansive interpretation of the statute. The Court suggested that, if the requirements of § 1823(e) were not fulfilled, only a claim of fraud in the factum, i.e. a forged signature on an instrument, would survive. *See id.* at 93–94, 108 S.Ct. at 402–03.

### C. 12 U.S.C. § 1821(d)(9)(A)

FIRREA also added § 1821(d)(9)(A), which provides that "any agreement which does not meet the requirements set forth in

section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation." 12 U.S.C. § 1821(d)(9)(A) (1991). Few courts as yet have had an occasion to interpret this provision and most that have considered it have not clearly differentiated the provision from the *Langley* Court's interpretation of § 1823(e). *See McCaugherty v. Siffermann*, 772 F.Supp. 1128, 1136 (N.D.Cal.1991); *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635, 645 (D.N.J.1990).

*IV. The Interrelationship between D'Oench, 12 U.S.C. § 1823(e) and 12 U.S.C. § 1821(d)(9)(A)*

The FDIC and the plaintiff sharply disagree on the scope of and relationship among the common law *D'Oench* doctrine and the two statutory provisions at issue. The FDIC's initial memorandum argued that the *D'Oench* doctrine and the two statutory provisions each independently bar AFSCME's claims; the FDIC, however, provided no theory as to how the statute and the common law fit together and made no attempt to distinguish between the two statutory provisions. AFSCME's opposition sets forth a powerful argument that *D'Oench* has been completely pre-empted by the passage of FIRREA in 1989; under this argument, any extra protection which the flexible common-law doctrine might have provided to the FDIC was extinguished by the statute. Thus, AFSCME argues, the court need only interpret the statute. Through their numerous subsequent memoranda and at oral argument, the FDIC addressed these issues with a new theory of interpretation which differentiates the two statutory provisions and suggests that *D'Oench* extends protection to the FDIC beyond that of the two statutory provisions.

The court resolves these issues below, but notes first that the exact interplay of the *D'Oench* doctrine and the statute does not substantially affect the court's final decision. Over the years, the case law surrounding *D'Oench* and the statute (particularly § 1823(e)) has cross-pollinated such that it is very difficult to decide where the statute ends and *D'Oench* begins. *See Royal Bank*

*of Canada v. FDIC*, 733 F.Supp. 1091, 1095 (N.D.Tex.1990) (describing how § 1823(e) and *D'Oench* are interpreted in tandem). Thus, the crucial question is the total protection that the statute and *D'Oench* together provide. The court believes, however, that an attempt to parse these difficult issues is warranted. Most courts have simply ignored the issue, and few, if any, parties have squarely raised these questions. *See Timberland Design Inc. v. First Service Bank*, 932 F.2d 46, 51 (1st Cir.1991) (declining to consider the pre-emption issue as not properly raised). This court has had the benefit of extensive briefing and the excellent arguments of counsel for both sides. It is to the interrelationship of the statute and *D'Oench* that the court now turns.

A. The Pre-emption of D'Oench by FIRREA

■ AFSCME argues that the common-law *D'Oench* doctrine has been pre-empted by the passage of FIRREA, which, they allege, Congress intended to be a comprehensive reform of the banking system. Under this theory, Congress occupied the field of banking regulation by passing FIRREA, thus replacing existing federal common law and obviating much of the need for new common law pronouncements. *See Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 97–98, 101 S.Ct. 1571, 1583–84, 67 L.Ed.2d 750 (1981). Plaintiff notes that the Supreme Court's jurisprudence in pre-emption cases establishes a presumption in favor of pre-emption; Congress need not affirmatively proscribe the use of federal common law. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 315, 101 S.Ct. 1784, 1791–92, 68 L.Ed.2d 114 (1981). The FDIC urges the court to reject this invitation to abandon *D'Oench*, a venerable doctrine which has survived and grown for half a century, including over two years subsequent to the passage of FIRREA.

■ Both parties appeal to judicial restraint to support their positions. Plaintiff correctly reminds the court that federal common law is interstitial in nature and should not be routinely fabricated absent a need for "an unusual exercise of lawmaking by federal

courts." *City of Milwaukee,* 451 U.S. at 314, 101 S.Ct. at 1791; *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1981). Further, the open-ended nature of federal common law generally, and the *D'Oench* doctrine in particular, leaves the court the uncomfortable task of discovering and implementing policy, a situation rarely appropriate for an Article III body. *D'Oench,* after all, is less a rule and more an expression of a federal policy. Plaintiff, both in their memoranda and most strongly in their counsel's oral argument, admonish the court that separation of powers requires the rejection of *D'Oench.* The FDIC, however, equally cautions that no court has ever held that *D'Oench* was pre-empted, although numerous courts have had the opportunity, both pre- and post-FIRREA. *See, e.g. Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991) (rejecting pre-emption pre-FIRREA); *FDIC v. McClanahan,* 795 F.2d 512, 514 n. 1 (5th Cir.1986) (same); *Midwest Sav. Ass'n v. National W. Life Ins. Co.,* 758 F.Supp. 1282, 1290 n. 6 (D.Minn. 1991) (rejecting pre-emption post-FIRREA); *Castleglen, Inc. v. Commonwealth Sav. Ass'n,* 728 F.Supp. 656, 662 (D.Utah 1989) (same). Further, most courts continue to apply *D'Oench* and the statutory provisions together without even considering the pre-emption question. Nonetheless, while the pre-emption argument has been rejected either explicitly or implicitly by other courts, there is no well-considered opinion on the subject.

■ Historically, courts have interpreted § 1823(e) and *D'Oench* together, drawing from a common body of caselaw. Courts have routinely concluded that both would apply, and thus have found no need to distinguish the two. *See RTC v. Murray,* 935 F.2d 89, 93 n. 3 (5th Cir.1991); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1095 (N.D.Tex.1990) (citing cases). In most situations, such interpretation of two legal provisions does not pose a significant problem. In the context of federal common law, however,

this sort of interpretation is an anomaly. If a statutory provision is exactly co-extensive with a doctrine of federal common law, the statute controls and the federal common law vanishes because there is no longer a need for it. Only if the common law doctrine is *not* co-extensive with the statute and the statute does not pre-empt it could the doctrine retain any vitality.

Some courts have called § 1823(e), the "statutory analogue" of *D'Oench. See FDIC v. Bertling,* 751 F.Supp. 1235, 1237 n. 1 (E.D.Tex.1990). Courts have often stated that § 1823(e) "codified" *D'Oench. See, e.g., Bowen v. FDIC,* 915 F.2d 1013, 1015 n. 3 (5th Cir.1990); *Shuler v. RTC,* 757 F.Supp. 761, 764 (S.D.Miss.1991). The distinction that these courts make between codification and pre-emption is by no means clear. Their continued use of *D'Oench* in conjunction with the statute, both pre- and post-FIRREA, suggests that *D'Oench* retains some independent vitality.[12] *See Reding v. FDIC,* 942 F.2d 1254, 1259 (8th Cir.1991) (holding that *D'Oench* and § 1823(e) provide independent grounds to bar a party's defense); *FDIC v. Orrill,* 771 F.Supp. 777 (E.D.La.1991) (same); *see also* Stillman, *Enforcing Agreements with failed Depository Institutions: A Battle with the FDIC/RTC Superpowers,* 47 Bus. Law. 99, 101–02 n. 19 (1991). Still other courts have left the question open by calling § 1823(e) a "partial codification" of *D'Oench. See, e.g. Tuxedo Beach Club Corp. v. City Fed. Sav. Bank,* 749 F.Supp. 635, 641 (D.N.J. 1990).

■ Plaintiff argues that the passage of § 1823(e) in 1950 did not pre-empt *D'Oench,* but that the enactment of FIRREA in 1989 did. This argument is actually two-fold. First plaintiff argues that FIRREA was intended to be comprehensive—to essentially wipe out all federal common law in the field of banking regulation. Plaintiff refers the court to the general statements of various members of Congress who touted FIRREA as a comprehensive overhaul of the financial

---

**12.** There is no doubt that *D'Oench* was applied to entities, such as FDIC-receiver and FSLIC, that were not protected by § 1823(e) before FIRREA. Courts, however, continue to apply *D'Oench* to FDIC–Corporate, despite the fact that § 1823(e) has always expressly applied to the FDIC in this capacity. *See, e.g., FDIC v. Investors Assocs. X, Ltd.,* 775 F.2d 152 (6th Cir.1985).

regulatory system.[13] The court cannot ignore such statements, although they are commonly made by members of Congress concerning high visibility pieces of legislation, because Congress' view of a program's comprehensiveness is relevant to the pre-emption inquiry. *See City of Milwaukee*, 451 U.S. at 317–19, 101 S.Ct. at 1792–94. No one disagrees that Congress intended FIRREA to radically strengthen the regulatory authority of certain government agencies and to reform the banking industry. There is no evidence, however, that Congress intended to sweep away all vestiges of what remained from the previous system. Indeed, Congress re-enacted certain provisions, such as § 1823(e), demonstrating that some (indeed a great deal) of the prior system should remain. Further, Congress is always presumed to be aware of a prevailing judicial interpretation of an existing statute. When, as in the case of FIRREA and § 1823(e), Congress incorporates an old provision into a new statutory scheme, the re-enacted provision is generally assumed to retain its judicially-created gloss, unless otherwise specified. *See Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Congress is presumed to have understood the relationship between *D'Oench* and § 1823(e) when it enacted FIRREA. Admittedly, *D'Oench* has grown to such tremendous proportions that "gloss" may be a misnomer. Yet the very "startling" nature of *D'Oench*'s severity, *see Bowen*, 915 F.2d at 1015, makes Congress' silence curious. The very fact that § 1823(e) was re-enacted without substantial change by FIRREA (and without comment by Congress) contradicts plaintiff's theory that FIRREA occupied the field to the exclusion of *D'Oench.*

Nonetheless, while the court rejects plaintiff's "macro"-theory—that FIRREA obliterates all federal common law in the field of banking regulation, plaintiff's argument also proceeds on another level. Plaintiff argues

that the specific statutory amendments made by FIRREA concerning the application of § 1823(e) protection make clear that *D'Oench* was to be completely pre-empted. The legislative history on this issue is scant. Section 1823(e), originally enacted in 1950, was incorporated by FIRREA without a significant modification, although it was extended to apply to both FDIC-corporate and FDIC as receiver. *See* 12 U.S.C. § 1823(e) (1991); 12 U.S.C. § 1821(d)(9)(A) (1991). The protection of § 1823(e) was also extended to the RTC, *see* 12 U.S.C. § 1441a(b)(4) (1991), and bridge banks, *see* 12 U.S.C. § 1821(n)(4)(I)(i)–(iv) (1991). Plaintiff claims that these statutory amendments are directly related to the line of cases which expanded *D'Oench* to situations where the original § 1823(e) did not apply. *See Beighley v. FDIC*, 868 F.2d 776, 783–84 (5th Cir.1989) (extending protection to FDIC-receiver); *Bell & Murphy & Assocs., Inc. v. Interfirst Bank Gateway*, 894 F.2d 750, 754–55 (5th Cir.1990) (extending protection to bridge banks); *Andrew D. Taylor Trust v. Security Trust Fed. Savings & Loan Ass'n*, 844 F.2d 337, 342 (6th Cir.1988) (extending protection to FSLIC). According to plaintiff, these amendments demonstrate that Congress was clearly aware of the developments of the federal common law and, further, sought to address them in FIRREA by completely codifying *D'Oench*. *See City of Milwaukee*, 451 U.S. at 314, 101 S.Ct. at 1791. Having incorporated this judge-made common law into a statute, Congress signalled that *D'Oench* was no longer necessary.

While Congress may have been responsive to the federal common law in its FIRREA reforms, such awareness does not necessarily demonstrate that Congress intended to obliterate *D'Oench*. FIRREA extends the reach of § 1823(e) to different entities, but it left the *substantive* protection of the statute virtually untouched.[14] Thus FIRREA says

---

**13.** In appendix D to plaintiff's memorandum in opposition to the FDIC's motion to dismiss, plaintiff cites numerous examples of members of Congress using the term "comprehensive" in reference to FIRREA. *See, e.g.,* 135 Cong.Rec. H2563 (daily ed. June 14, 1989) (quoting Rep. Ridge stating that FIRREA is "bold and comprehensive" and "the most important legislation

concerning our financial system since Congress created this Nation's financial safety net with the Federal Reserve Act of 1913 and the Banking Act of 1933").

**14.** The only marginally "substantive" change amended the words "right, title or interest" to "interest." 12 U.S.C. § 1823(e) (1991).

nothing about the substantive reach of *D'Oench* or about the interplay between *D'Oench* and § 1823(e). The court agrees with plaintiff that, in holding that § 1823(e)–type protection extends to the RTC, to bridge banks or to FDIC-receiver, a federal court must ground its decision in the various statutory provisions, rather than in *D'Oench;* because the statute covers these areas, the interstices have been filled and there is no longer a need for federal common law, such as *D'Oench.*[15] However, none of this suggests that Congress intended to remove any additional substantive protection which *D'Oench* may provide beyond the reach of § 1823(e).

■ The question thus becomes whether § 1823(e) pre-empted *D'Oench* in 1950 (rather than in 1989) and whether *D'Oench* provides substantive protection more expansive that § 1823(e). Section 1823(e) was inextricably linked with *D'Oench* for over forty years. Because *D'Oench* is common law, and hence subordinate to statute, a statute that is coextensive with the common law provision should supplant the common law. Despite the fact that courts have generally construed *D'Oench* and § 1823(e) together, the continuing vitality of *D'Oench* throughout these years counsels against pre-emption. Further, some courts have articulated differences in the scope of protection provided by *D'Oench* and the statute. *See, e.g., Vernon v. RTC,* 907 F.2d 1101, 1106 (11th Cir.1990);[16] *Tuxedo Beach Club Corp. v. Federal Sav. Bank,* 749 F.Supp. 635, 642 (D.N.J.1990); *Castleglen, Inc. v. Commonwealth Sav. Ass'n,* 728 F.Supp. 656, 662 (D.Utah 1989); *see also* Stillman, *supra,* at p. 109–110 & n. 13; Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail,* 62 S.Cal.L.Rev.

253, 270–71 (1988). The court is persuaded by these cases and commentators, at least to the extent that they draw distinctions between *D'Oench* and § 1823(e).

The court holds that Congress did not intend for *D'Oench* to be totally preempted by FIRREA; rather, FIRREA partially codified *D'Oench's* common law regime. *See Tuxedo Beach Club,* 749 F.Supp. at 641. By holding that *D'Oench* was not pre-empted by FIRREA, this court simply agrees with all of the federal courts who have at least considered this issue implicitly. While both *D'Oench* and the statutory provisions protect similar interests of the government, each is capable of a somewhat independent interpretation, as will be discussed below, so that they do not completely overlap. It is this added protection given by *D'Oench,* which Congress has neither codified nor demonstrated any intent to repudiate, that remains viable in the interstices of FIRREA. *D'Oench* after all is based on a policy that the Supreme Court found in the Federal Reserve Act. *See D'Oench,* 315 U.S. at 456–57, 62 S.Ct. at 678–79. That policy, to protect the government against secret agreements, is just as valid today, and indeed is probably more valid given the recent savings and loan disaster. The passage of § 1823(e) in 1950 further revealed and reinforced that policy by providing a specific statutory scheme to address some of the concerns raised by *D'Oench.* The policy revealed in the Federal Reserve Act and emphasized by § 1823(e) applies to situations that fall both inside and outside the scope of § 1823(e). It is to these situations outside of § 1823(e) that *D'Oench* applies and courts have retained *D'Oench* (with Congress' silence and approval[17]) to deal with such situations; in this sense, *D'Oench* can best be described as a safety net which Congress has left to insure

---

**15.** The Supreme Court in *Langley,* while citing the *D'Oench* case, grounded its decision in § 1823(e) only, as the statute clearly applied to the case.

**16.** The court notes that *Vernon,* a case whose logic the plaintiff often cites for their own theory, supports the proposition that *D'Oench* extends beyond the bounds of § 1823(e).

**17.** The court does not believe that Congress' silence can always be so readily interpreted.

Courts must be cautious when reading something into nothing. In this situation, where *D'Oench* has been constantly cited by federal courts and has flourished, where *D'Oench* enforces the same policies as the statute, and where Congress has simply re-enacted a statutory provision (§ 1823(e)) which is surrounded by such an important common law development, the court believes that Congress has shown its approval of *D'Oench.* Indeed, not only its silence, but also its affirmative re-enactment of § 1823(e) demonstrate Congress' approval.

that the specific wording of the statute does not prevent the true application of Congress' policies. Indeed, one of the principal purposes behind FIRREA's amendment of § 1823(e) and creation of § 1821(d)(9)(A) was to extend further protection to the federal government when stepping in for failed financial institutions. It seems at odds with this clearly expressed intent that Congress would, without a word, have removed this long-standing doctrine which served exactly that purpose.

B. The Scope of D'Oench, § 1823(e), and § 1821(d)(9)

i. *The policies behind D'Oench and §§ 1823(e) and 1821(d)(9)*

Having held that *D'Oench* remains a viable common-law doctrine, the court must now define the boundaries set by the statute and then discuss the place that *D'Oench* serves to fill in gaps left by FIRREA and to further the federal policy to protect the FDIC from certain types of claims. The vague contours of both *D'Oench* and the statutory sections, however, cannot be understood at all without some discussion of the policy that underlies them. The policy considerations that led to the birth of *D'Oench* subsequently resulted in the congressional enactment of § 1823(e). Admittedly, the words of the statute provide the best guides to interpretation for § 1823(e) and § 1821(d)(9)(A), but these are by no means unambiguous; case law interpreting the statute has repeatedly focused on the purposes behind the statute. *See, e.g., FDIC v. Meyer,* 755 F.Supp. 10, 14 (D.D.C. 1991); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1095 (N.D.Tex.1990). *D'Oench,* moreover, is nothing more than the policies which created it. Only by understanding what the doctrine attempts to protect can *D'Oench* be given any meaning. Thus, the court must first lay out the policy considerations (and rhetoric) which have surrounded the application of both the doctrine and the statute. This discussion is especially crucial in a case such as this one which involves a transaction (buyer-seller of commercial paper) that is outside the traditional context (lender-borrower) for the application of *D'Oench* and § 1823(e). Plaintiff here argues that *D'Oench* and § 1823(e) have no application to transactions such as that between NBW and plaintiff, whereas the FDIC seeks to fit them into the parameters of a traditional *D'Oench* case. Thus the issues are not simply what the technical requirements of § 1823(e) and *D'Oench* are, but rather whether the court even needs to consider these requirements.

■ *D'Oench* itself cited a federal policy, revealed in the Federal Reserve Act, to protect the FDIC from misrepresentations concerning the assets of banks which it insures. *See D'Oench,* 315 U.S. at 456–57, 62 S.Ct. at 679. Bank examiners must be able to rely on the books of the institutions which they insure in order to make appropriate assessments of solvency. *D'Oench* sets forth the language which is repeated throughout subsequent *D'Oench* and § 1823(e) cases: "[t]he test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 681. *Langley* reinforces that this policy undergirds both *D'Oench* and § 1823(e). *See Langley,* 484 U.S. at 91–92, 108 S.Ct. at 401–02. Thus, a court examining whether a particular claim or defense is barred under these provisions must consider whether the transaction at issue—explicitly an "agreement" under the terms of the statute or an "arrangement" under *D'Oench*— would tend to deceive bank examiners.

■ *D'Oench* and § 1823(e) also insure that creditors and depositors (as well as insurers) are favored over those who can protect themselves against harm. *See Langley,* 484 U.S. at 94, 108 S.Ct. at 402–03; *Carico v. First Nat. Bank of Bogata,* 734 F.Supp. 768, 770 (E.D.Tex.1990). Whereas depositors and creditors have little control over how a bank uses their money and rarely have lawyers to help them structure their relationship to the bank, others, most particularly borrowers, generally rely on complex, written agreements that completely set forth their relationship to the bank. *D'Oench* and § 1823(e)

implement a regime that places the risk on borrowers if they do not get all of the terms of their agreements in writing. *See Langley,* 484 U.S. at 94, 108 S.Ct. at 402–03; *Fair v. NCNB Texas Nat. Bank,* 733 F.Supp. 1099, 1103 (N.D.Tex.1990). Although most cases have focused on borrowers, some have extended this logic to bar *any* parties who could have protected themselves through an appropriate written agreement from asserting claims and defenses concerning that agreement. *See Carico,* 734 F.Supp. at 768. This policy rationale suggests two related inquiries for a court considering whether *D'Oench* and § 1823(e) have any application outside the traditional lender-borrower context. First, in a very generic sense, is the party adverse to the FDIC more like a borrower or a creditor/depositor?[18] If the latter, then *D'Oench* may simply not apply, though the expansion of *D'Oench* over the last forty years suggests that the inquiry may not be this simple. Second and more concretely, could the party have taken reasonable steps to protect themselves through some form of written agreement?[19] If the party is relying on an unwritten agreement for a claim or a defense, then either *D'Oench* or § 1823(e) probably applies.

The Supreme Court in *Langley* set forth an additional rationale for § 1823(e). The court held that, not only was § 1823(e) intended to permit bank examiners to rely on the bank's books, as *D'Oench* had stated, but also that § 1823(e) would insure that bank officers would give "mature consideration" to "unusual loan transactions." *Langley,* 484 U.S. at 92, 108 S.Ct. at 401. By requiring the approval of the appropriate committees and contemporaneous recording, § 1823(e) would help prevent the insertion of fraudu-

lent terms which could subsequently be used to the detriment of the FDIC. *See id.*

### ii. The interpretation of § 1823(e)

Plaintiff focuses the court's attention on two crucial words in § 1823(e)—"agreement" and "asset." Plaintiff asks the court to narrowly interpret the meaning of both of these words, arguing that the FDIC's proposed construction would virtually be limitless. The FDIC asks the court to continue down the path begun by the Supreme Court in *Langley* by interpreting "agreement" very broadly and to construe "asset" to refer to anything which affects the financial situation of the FDIC as receiver for a failed bank.

#### a. "Agreement"

■ There is no question that *Langley* expands the definition of "agreement" in § 1823(e) beyond the traditional meaning of the word. AFSCME seeks to confine *Langley* to its facts by limiting the term "agreement" to its traditional meaning *plus* affirmative misrepresentations made as a condition to performance of another agreement. The FDIC cites the substantial case law in the wake of *Langley* that expands the definition of "agreement" to include misrepresentations of all kinds and material omissions. *See FDIC v. Bell,* 892 F.2d 64, 65 (10th Cir.1989); *FDIC v. Sullivan,* 744 F.Supp. 239, 241–42 (D.Colo.1990). The court is persuaded by the weight of authority that interprets *Langley* broadly. If a party cannot assert fraudulent misrepresentations made by the bank, then it should not be able to win its case by describing these as material omissions. *See FDIC v. State Bank of Virden,* 893 F.2d 139, 144 (7th Cir.1990); *Bell,* 892 F.2d at 67. Admittedly, this stretches the

---

18. At least two courts have made clear distinctions between situations involving the debts owed *to* a failed bank and "pure obligations" of the bank. *See Vernon v. RTC,* 907 F.2d 1101 (11th Cir.1990) (holding *D'Oench* inapplicable to claims by shareholders of the bank for misrepresentation as to the financial situation of the bank); *Agri Export Cooperative v. Universal Sav. Ass'n,* 767 F.Supp. 824, 832 (S.D.Tex.1991) (holding *D'Oench* and § 1823(e) inapplicable to the bank's obligation to fund a letter of credit which was a "straightforward obligation" of the bank).

19. The Ninth Circuit established an "innocent borrower" exception to the *D'Oench* doctrine in *FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974). In that case, the court held that the borrower was innocent of any wrongdoing or even negligence and had no part in a scheme that would tend to deceive the bank examiners. Although courts have avoided adopting this exception because of its potentially broad applicability, the question of whether a party could have done anything to protect himself is similar to the inquiry in *Meo.* One could also read *Vernon* and *Agri Export Cooperative* in the same fashion.

bounds of the term "agreement," but this interpretation seems to flow directly from the Supreme Court's opinion in *Langley.* Material omissions, after all, are just as much inducements to sign an agreement as are misrepresentations and *Langley* clearly contemplates the bar of any sort of fraudulent inducement claim or defense, based on an unwritten warranty, against the FDIC. In addition, permitting suit on omissions would practically swallow the *Langley* rule since parties can generally turn a misrepresentation into an omission by means of artful pleading. The regime that *Langley* creates is quite harsh—plaintiff not only has a responsibility to record all representations, but also must affirmatively ask questions and record the answers (so that there are no omissions) if the party intends to rely on these omissions for a lawsuit. Thus the term "agreement" in § 1823(e) and § 1821(d)(9)(A) includes not only misrepresentations that are conditions to performance but also omissions.

### b. "Asset"

■■■ Plaintiff argues that "asset" has a very specific meaning in § 1823(e). Because loans are the principal assets of banks, plaintiff encourages the court to interpret "asset" to mean "loan." In support of this argument, plaintiff notes the writing requirement of subsections (3) of the statute which identifies the bank board of directors or the loan committee as the appropriate bodies who must consider an "agreement." In addition, plaintiff reminds the court that the Supreme Court in *Langley* stated that one of the policy justifications behind § 1823(e) was to force bank officials to give careful consideration to lending decisions. Plaintiff also argues that the language of the *Langley* opinion clearly contemplates that "asset" refers to a bank loan.

The FDIC does not actually attack this interpretation of the word "asset." Their memoranda gloss over the issue, arguing that § 1823(e) applies, and that, even if it does not, that *D'Oench* does. Nor does the FDIC suggest that there are any limits on their interpretation of "asset." Plaintiff warns that a vast interpretation of "asset" would mean that no contract for supplies or servic-

es to a bank could be a basis for recovery because none of these agreements would be recorded in writing under the strict requirements of § 1823(e). At least one commentator has, however, suggested that this expansive interpretation is the correct one. *See* Stillman, *supra,* at 109.

The courts who have faced cases that involve an interpretation of the word "asset" in § 1823(e) have generally preferred to ignore the statute and founded their holdings on the more flexible *D'Oench* doctrine. *See, e.g., Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir. 1990) (stating that *D'Oench* protects FDIC from loss of "negative assets"); *Castleglen, Inc. v. Commonwealth Sav. Ass'n,* 728 F.Supp. 656, 671 (D.Utah 1989) (applying *D'Oench* to any claim that would "diminish the value of the assets" or "increase the liabilities" held by the receiver). Other courts have held that the FDIC or other institution must actually come into possession of the asset for § 1823(e) to apply; if a plaintiff has already won a judgment against the bank, *see Grubb v. FDIC,* 868 F.2d 1151 (10th Cir.1989), or has already paid off a note, *see Commerce Fed. Sav. Bank v. FDIC,* 872 F.2d 1240 (6th Cir.1989), then the FDIC does not "acquire" the asset under the statute. *See FDIC v. Bracero & Rivera, Inc.,* 895 F.2d 824, 830 (1st Cir.1990) (holding that the asset requirement of § 1823(e) is not satisfied if "acts independent of the alleged secret agreement" invalidate the note). In one of the more reasoned decisions, a district court in Texas held that § 1823(e) requires that the FDIC obtain an interest in a "particular, identifiable" asset. *Agri Export Cooperative v. Universal Sav. Ass'n,* 767 F.Supp. 824, 833 (S.D.Tex.1991).

The court is persuaded, for the most part, by plaintiff's interpretation of "asset" for several reasons. The language of the statute suggests that Congress was referring to traditional loan transactions; subsection (3) specifically refers to the loan committee and the other subsections describe a process that might be followed in the course of making a normal loan. The writing requirements, which are stringent, will almost never be satisfied by investors, such as plaintiff, creditors, or tort claimants. There is no hint in

any of Congress' pronouncements that such individuals should be disfavored. Indeed, one of the traditional rationales for the *D'Oench* doctrine is to insure that these individuals are favored when compared to borrowers. *See Langley,* 484 U.S. at 94, 108 S.Ct. at 402–03; *Kilpatrick v. Riddle,* 907 F.2d 1523, 1529 (5th Cir.1990). Nor does the court find an intent by Congress to radically alter the day-to-day transactions of the banking industry by requiring all customers and business associates of a bank to demand that all issues and agreements be placed before the board of directors (or the loan committee). *See Agri Export Cooperative,* 767 F.Supp. at 834.

Further, the court reads the Supreme Court's opinion in *Langley* to distinguish between an asset and a liability. *See Langley,* 484 U.S. at 91, 108 S.Ct. at 401 (describing the statutory provisions which permit the FDIC to finance the "purchase of [ ] assets (and assumption of [ ] liabilities)"). The language of the entire opinion suggests that the word "asset" has a particular meaning and is not simply a stand-in for "money." Plaintiff's definition, however, of the word "asset" as "bank loan" is too narrow; accepting this definition would reject case law from virtually every jurisdiction. Thus, it is appropriate that "asset" should also refer to loan participation agreements, promises to make future loans, and sales of property or securities which involve the making of a note from an individual or entity to the bank. The court does not need to decide the full scope of the banking activities which might fall into the term "asset." Under no circumstances, however, should the term be interpreted so broadly as to encompass any liability or other existing condition which affects the financial condition of the receivership.[20]

This interpretation also seems proper because it ties § 1823(e) to the original *D'Oench* case to some degree. No authority disputes that the original passage of § 1823(e) was intended to provide statutory protection akin to *D'Oench.* The provision was enacted in 1950, long before *D'Oench* began its ungainly growth. Under this interpretation, Congress codified the original *D'Oench* decision, focusing on its particular facts through the language of the statute ("agreement" and "asset"). The federal policy revealed in *D'Oench* is, however, somewhat greater in scope. Subsequent decisions have demonstrated this by expanding *D'Oench,* which, because it is federal common law, is far more flexible than statutory enactments. The court will discuss the extent of the *D'Oench* doctrine below, but first must deal with Congress' enactment of § 1821(d)(9)(A), which adds to the statutory protection accorded the FDIC.

### iii. § 1821(d)(9)(A) and its relationship to § 1823(e)

Post–FIRREA courts barring claims against the FDIC have almost exclusively based their decisions on § 1823(e) and *D'Oench.* Section 1821(d)(9)(A), a completely new provision added by FIRREA, explicitly incorporates the requirements of § 1823(e), but its meaning is by no means clear. AFSCME and the FDIC suggest competing interpretations of § 1821(d)(9), neither of which is entirely satisfactory. In essence, the court must choose the interpretation which assumes the least problematic drafting error on the part of Congress. Plaintiff argues that, under its plain language, § 1821(d)(9)(A) incorporates all of the requirements of § 1823(e), including the "asset" requirement; such an interpretation would, however, make the two sections substantially similar in meaning. The FDIC argues that the two sections could not have the same meaning, and that § 1821(d)(9)(A) should be interpreted to extend § 1823(e)'s protection to any agreement, whether or not an interest in an asset is at stake. Under this theory, the court would have to ignore the "asset" language in subsection (2) of

---

**20.** Further support for the court's conclusion derives from counsel for the FDIC, who appears to have conceded this point at oral argument in the following exchange:

Court: ... On that you agree that general money is not an asset?

Counsel: We would interpret that as requiring, at least to the extent it refers to an "asset" that there be a specific asset; such as, again, a mortgage, a promissory note, or actual real estate.

Transcript of January 28, 1992, Hearing at 20.

§ 1823(e) when interpreting § 1821(d)(9)(A). The legislative history of this section is virtually non-existent, so the choice is between the lesser of two evils.

There is no particular hierarchy in statutory interpretation to aid the court in selecting which error is preferable. Neither option—interpreting certain words out of existence or interpreting two provisions as nearly identical—is desired. The FDIC's proposed interpretation appears, however, to suffer from both problems. Not only would the FDIC's theory force the court to ignore § 1821(d)(9)(A)'s reference to an "asset," but it would also make other sections of FIR-REA superfluous. As noted previously, the average creditor of a failed bank could not satisfy the recording requirements of § 1823(e), which are incorporated into § 1821(d)(9)(A). There is no evidence that Congress desired such a result, and indeed several other provisions of FIRREA suggest that Congress intended a different result. Section § 1821(e) sets forth procedures for the FDIC's dealings with creditors and permits the FDIC to disaffirm contracts by paying actual damages. Under the FDIC's construction of § 1821(d)(9)(A), there would be no need for FDIC to have the right to disaffirm because § 1821(d)(9)(A) would bar any claims made against the FDIC based on such contracts.[21]

Thus the court prefers the plaintiff's interpretation,[22] despite the fact that it makes § 1821(d)(9)(A) into a somewhat repetitive provision; if nothing else, it makes clear that § 1823(e)'s protection extends to the FDIC in any capacity. In addition, the court notes that § 1821(d)(9)(A) states that an agreement which does not meet the requirements of § 1823(e) "shall not form the basis of, or substantially comprise," a claim against the FDIC. This language suggests an attempt by Congress to codify the Supreme Court's holding in *Langley* by making clear that a party need not sue expressly on the agreement to be barred. Torts and other claims which center around an unrecorded agreement are also barred, even though the plaintiff is not asserting the agreement itself explicitly against the FDIC. This interpretation is particularly plausible because § 1821(d)(9)(A) was enacted as part of FIR-REA's provisions regarding the FDIC's role as receiver, i.e. when FDIC would be defending against affirmative claims.

### iv. The D'Oench Doctrine

■ Having decided that *D'Oench* was not pre-empted by FIRREA and having laid out the groundwork for an interpretation of the statute, the sole remaining issue is the exact extent of *D'Oench*'s common law regime. As already noted, courts have historically construed § 1823(e) and *D'Oench* together, often holding, in the same breath, that both bar certain claims; once again, this manner of interpretation is flawed because federal common law, by its nature, ceases to exist when a statute replaces it. The only manifestations of *D'Oench* which still exist are those which are not covered by the statute. The FDIC argues that *D'Oench* is distinct from § 1823(e) because it has no "asset" requirement, and thus could apply to any claim or defense which could affect the financial status of the FDIC in any capacity. AFSCME would have the court interpret *D'Oench* as narrowly as the statute; this argument would render *D'Oench* functionally pre-empted, a result which the court has already rejected.

The majority of courts who have considered the matter have determined that *D'Oench* may be applied outside the lender-borrower context. *See Hall v. FDIC*, 920

---

**21.** As at least one other court has noted, FSLIC (and also FDIC) was created, in part, to provide for the orderly settlement of claims against the failed bank. *See Vernon v. RTC*, 907 F.2d 1101, 1108 (11th Cir.1990). The FDIC's interpretation of § 1821(d)(9)(A) is somewhat incongruous with this mission.

**22.** Indeed, were the court to accept the FDIC's interpretation of § 1821(d)(9)(A), it would be much more receptive to the preemption argu-

ment. Interpreting § 1821(d)(9)(A) as an expansive protection of the FDIC would make *D'Oench* virtually non-existent because the statute would then protect the FDIC from almost any claim. While such an interpretation would curb the amount of common law that judges would be required to create, the court simply does not believe that the plain language of the provision permits such a broad reading.

F.2d 334 (6th Cir.1990); *McCaugherty v. Siffermann*, 772 F.Supp. 1128 (N.D.Cal.1991); *Royal Bank of Canada v. FDIC*, 733 F.Supp. 1091 (N.D.Tex.1990). This view indicates that *D'Oench* has no asset requirement. *See Bell & Murphy & Assocs., Inc. v. Interfirst Bank Gateway*, 894 F.2d 750, 753 (5th Cir. 1990). Two courts, however, have forbidden the application of *D'Oench* to claims involving a pure obligation of the bank, rather than an obligation of a debtor to the bank. *See Vernon v. RTC*, 907 F.2d 1101 (11th Cir.1990); *Agri Export Cooperative v. Universal Sav. Ass'n*, 767 F.Supp. 824 (S.D.Tex.1991). Other courts have suggested that *D'Oench* may apply against a borrower even when there is no agreement. *See McCaugherty; Tuxedo Beach Club*, 749 F.Supp. at 642. In attempting to distinguish *D'Oench* and § 1823(e), one district judge concluded that § 1823(e) was both broader and narrower than *D'Oench:* "It is broader in that it applies to *any* agreement, whether or not it was secret and regardless of the maker's participation in a scheme; it is narrower in that it applies *only* to agreements and not to other defenses the borrower might raise." *Id.* at 642 (emphasis in original).

As the court has previously stated, *D'Oench* can best be described as a safety net; § 1823(e) and § 1821(d)(9)(A) are Congress's attempts to codify, at least in part, the policy represented by *D'Oench*, but *D'Oench* remains to cover situations which fall through the cracks. For example, an investor goes to a bank and asks the bank to place the money in government securities that pay a fixed rate of interest; at the same time, however, he makes a secret side agreement that states that the bank will actually

pay him double the rate of interest. When the bank fails and the FDIC enters as receiver, the investor sues for his excess interest. Under the plaintiff's and this court's reading of § 1823(e), the statute would not apply because the asset requirement would not be satisfied. Yet the same equitable principle that generated the original *D'Oench* case and Congress' passage of § 1823(e) demands that the investor not be able to assert this agreement against the FDIC. *D'Oench* must apply to this situation and thus is not bound by the asset requirement.

The *D'Oench* doctrine as it now exists embodies the policies discussed above, though is not bound by the "asset" requirement or the particular writing requirements of § 1823(e).[23] The court disagrees, however, with the courts that have held that *D'Oench* can apply when there is no agreement. To so loose *D'Oench* from its moorings by removing its relationship to an agreement seems a radical step that is contrary to virtually all of the caselaw and the policies surrounding *D'Oench; D'Oench* cases have always revolved around secret side agreements. It should be noted that the FDIC does not even argue this point, although they cite frequently to *McCaugherty*.[24] Particularly given the extremely broad definition of "agreement" which *Langley* mandates for § 1823(e), this court is not prepared to abandon *D'Oench*'s connection to some sort of agreement or "arrangement" which would tend to deceive bank examiners. Indeed it is the language of the original *D'Oench* case which is instructive on this point: "[i]t would be sufficient in this type of case that the maker lent himself to a scheme or arrange-

---

**23.** That *D'Oench* does not include the stringent writing requirements of § 1823(e) is implicit in the case law. Courts have generally avoided stating what sort of writing requirement *D'Oench* includes, but their language indicates that, when *D'Oench* applies, but § 1823(e) does not, a less stringent writing requirement should be applied. *See, e.g., Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989) (requiring that the writing be "clearly evidenced in the bank's records"); *Fair v. NCNB Texas Nat. Bank*, 733 F.Supp. 1099, 1105 (N.D.Tex.1990) (applying an "objective standard" as to what would apprise a bank examiner of an agreement). This result is appropriate in the light of the flexible nature of federal common

law, such as *D'Oench*, and the court's holding that the strict requirements of § 1823(e) are inappropriate for transactions outside the loan context. As the parties have not briefed this issue fully and the court need not decide it at this time, the court will decline to elaborate further. The court notes, however, that contracts for services, which would not fall under § 1823(e), could reasonably survive *D'Oench*'s less stringent writing requirement if the contract were in writing and recorded in the bank's records.

**24.** Both *McCaugherty* and *Tuxedo Beach* involved situations where there existed agreements within the meaning of *Langley*.

ment whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 681. There must be some sort of scheme or arrangement, which suggests an "agreement" within the terms defined by *Langley*. As one circuit explained it, "when the failure to put in writing what was said orally is the gravamen of the objection to the bank's conduct," *D'Oench* applies. *FDIC v. State Bank of Virden*, 893 F.2d 139, 144 (7th Cir.1990); *Royal Bank*, 733 F.Supp. at 1096 n. 9. This "test" reveals the equitable principle that stands behind the *D'Oench* doctrine. *D'Oench* determines, as between two "innocents" (the FDIC and the "wronged" bank customer) who should bear the cost of the failed bank's wrongs. If the customer bears the slightest blame—by failing to protect himself by getting an agreement in writing, then the scale tips in favor of the FDIC and *D'Oench* bars the claim or defense.

This discussion does not make the application of *D'Oench* to plaintiff's claims significantly easier. *D'Oench* after all is based on a federal policy and plaintiff's claims must be examined in light of the policies behind *D'Oench* and the questions which these policies suggest. Both plaintiff and the FDIC (and the majority of other courts) agree that plaintiff's complaint must be examined claim by claim to determine whether *D'Oench* bars each individual claim. It is to this inquiry that the court now turns.

## V. AFSCME's Claims

 Having extensively discussed the legal issues in the abstract, the court can dispense with the FDIC's motions to dismiss in a more summary fashion. Under the court's interpretation of FIRREA, neither § 1823(e) nor § 1821(d)(9)(A) apply to AFSCME's claims. AFSCME's claims do not refer to a loan or other specific, identifiable asset, nor

has the court found any persuasive authority that expands the definition of "asset" under § 1823(e) to include money funnelled through the bank for investment purposes. The stringent writing requirements of § 1823(e) indicate that AFSCME's purchase of commercial paper from NBW was not the sort that was intended to be regulated by § 1823(e) or § 1821(d)(9)(A). Individuals and entities who use a bank as a conduit for their investments generally do not seek approval of the board of directors or the loan committee; such a requirement is burdensome and contrary to what this court perceives to have been Congress' intent. In addition, the Supreme Court's interpretation of § 1823(e) in *Langley* clearly did not anticipate the result recommended by the FDIC. Thus, § 1823(e) and § 1821(d)(9)(A) are not applicable to any of AFSCME's claims because none of the claims involve an "asset."[25]

Nonetheless, the *D'Oench* doctrine may still bar some or all of AFSCME's claims.[26] As discussed above, *D'Oench* is a principle of equitable estoppel that focuses on an arrangement which would tend to deceive bank examiners and that is not restricted by the "asset" requirement. AFSCME's claims include fraud, misrepresentation, breach of fiduciary duty, and various securities law violations. The court will consider the causes of action claim by claim, as each has its own peculiarities.

### A. Count I—Violation of §§ 5 and 12(1) of the Securities Act of 1933

 Plaintiff alleges that NBW violated the Securities Act of 1933 by selling WBC commercial paper that was unregistered and of less than prime quality. Under plaintiff's theory, such sales violate § 5 and § 12(1) of the Act. Plaintiff argues that this federal statute establishes a strict liability offense that plaintiff need not prove through the use of an agreement which might be barred by

---

**25.** In light of the court's ruling that § 1821(d)(9)(A) contains an "asset" requirement, counsel for the FDIC appears to concede that neither statutory provision applies to AFSCME's claims. "In fact, we are not dealing with an asset at all. We are, in fact, dealing with a contingent liability." Transcript of January 28, 1992, Hearing at 9.

**26.** Indeed, were the court to dispense with the asset requirement in § 1821(d)(9)(A) or to interpret "asset" to mean anything which would affect the FDIC's financial situation, the provision would not encompass a greater array of claims than the court's interpretation of *D'Oench*.

*D'Oench* or FIRREA. Further, plaintiff argues, the policies of the securities' laws would be undermined if the FDIC, when stepping in for a failed bank, were immune from such suits. The FDIC responds that plaintiff's reliance on § 12(1) is simply another clever attempt to fabricate a claim based on an agreement not reflected in the bank's records. FDIC argues that plaintiff instead should pursue (as they currently are) a remedy against the individual officers of NBW who are accused of perpetrating this violation. The FDIC also notes that courts have commonly rejected attempts to base claims against the FDIC on state and federal securities laws. *See Kilpatrick v. Riddle,* 907 F.2d 1523 (5th Cir.1990). Nonetheless, the court knows of no case where a court has ruled on a § 12(1) claim. All other cases have involved material misrepresentations and fraud as proscribed by § 10b–5 of the Securities Exchange Act of 1934 and other similar provisions. *See, e.g., id.; FDIC v. Investors Assocs. X, Ltd.,* 775 F.2d 152 (6th Cir.1985).

Under § 12(1) of the Securities Act of 1933, codified at 15 U.S.C. § 77*l*, "[a]ny person who—offers or sells a security in violation of section 77e [§ 5 of the Securities Act of 1933] of this title, . . . shall be liable to the person purchasing such security from him . . . ." Section 5, codified at 15 U.S.C. § 77e, requires a seller of commercial paper to register the security unless the commercial paper is of a sufficiently high grade to be termed "prime" quality. Plaintiff alleges that WBC commercial paper was not of prime quality and was also unregistered, thus creating a violation of § 5 and permitting recovery under § 12(1). Plaintiffs emphasize that the liability derives not from any agreement, but rather directly by operation of a strict liability statute.

■ Generally a party is not barred by *D'Oench* if they are asserting an independent legal obligation which does not arise from an agreement. *See Patterson v. FDIC,* 918 F.2d 540, 543 (5th Cir.1990) (holding that Home-

stead right under Texas state constitution exists independent of any agreement by the parties); *In re Howard,* 65 B.R. 498 (Bankr. W.D.Tex.1986) (same); *but see Union Fed. Bank v. Minyard,* 919 F.2d 335, 336 (5th Cir.1990) (holding that appeal to usury laws did not bar the bank's *D'Oench* defense). Such a result appears appropriate in the light of the policies surrounding *D'Oench. D'Oench* protects the FDIC from secret side agreements or any arrangement in which plaintiff takes part that would tend to deceive bank examiners. When the act being sued upon has no connection to an agreement, but rather involves an independent basis for liability, *D'Oench* is not implicated. As previously stated, *D'Oench* applies when the gravamen of the FDIC's assertion is the failure to get an agreement in writing. *See FDIC v. State Bank of Virden,* 893 F.2d 139, 144 (7th Cir.1990).

Here AFSCME's § 12(1) claim is not based on an "agreement" of any kind, even under the generous terms of *Langley* or any other reasonable interpretation of *D'Oench.* NBW's liability results from the sale of unregistered securities. Plaintiffs need not prove that there was any other agreement between the parties, such as one that required NBW to purchase only low-risk securities with AFSCME funds.[27] Had NBW officials said absolutely nothing about what it was purchasing as an investment for plaintiff, AFSCME would still have the exact same claim. Thus, even if the "asset" requirement were satisfied, neither § 1823(e) nor § 1821(d)(9)(A) would apply to the § 12(1) claim because it does not rest on an agreement.

The FDIC instead argues that "[p]laintiff cannot hold FDIC responsible for alleged liabilities of NBW relating to plaintiff's purchase of WBC commercial paper that were not reflected in the bank's books and records." Def.'s Mem.Supp.Mot.Dis. at 18. It is unclear, however, what has been alleged by plaintiff that is not reflected in the bank's records. The transaction—the sale of commercial paper—itself is in the bank's records

---

27. There is no dispute that there was an agreement to purchase securities and that this agreement was recorded in the bank's books. The agreement which FDIC is asserting to be both unrecorded and the basis of AFSCME's claim is the agreement that NBW would purchase for AFSCME only low-risk securities. *See* Transcript of January 28, 1992, Hearing at 6.

and it is this transaction itself which creates the alleged liability—not any side agreement concerning the safety of the investment.[28] Even were the court to accept the FDIC's expansion of *D'Oench*,[29] the FDIC's argument falls under its own weight.

■ An analysis of the policies that generated *D'Oench* leads to the same result. Plaintiff did not lend themselves to a transaction that would tend to deceive bank examiners. All that plaintiff needs to prove is that the sale—which is on the bank's books—was made.[30] The fact that the bank took an illegal action over which plaintiff had no control and which was totally independent of the plaintiff cannot be a basis for the application of *D'Oench*. The illegality of the commercial paper is the fact that creates the liability, not any act or agreement between the parties.[31] *D'Oench* is a principle of equitable estoppel which requires some passive (including negligent) or active act by a party whose claims and defenses are then barred. AFSCME could not have reasonably protected themselves. *D'Oench* bars claims when the plaintiff could have recorded some agreement or condition in the bank's records which it is

now asserting as a sword or a shield against the FDIC. Under its theory in this case, the FDIC would have investors obtain a written agreement for each daily commercial paper transaction (recorded in the minutes of the bank's board of directors) that stated that the bank would refrain from breaking the law. This result is not supportable in either law or common sense.[32]

The FDIC suggests that it would be an anomaly to hold them liable for the failed bank's technical violations of the securities laws, while they would not be liable for affirmative acts of fraud under *Langley*. First the court takes issue with the FDIC's characterization of the alleged violations as "technical." The registration requirements of the Securities Act of 1933 are designed to protect against the sale of just this sort of unsound commercial paper. Only prime quality paper, where default is not a significant threat, can be sold without registration. In addition, *D'Oench* creates preferences among those raising claims or defenses against the FDIC, in part, according to how easy it would have been for the party to protect themselves;

**28.** To some extent, the FDIC's argument is that there was no way for bank regulators to know, from reading NBW's books, that the sale of WBC commercial paper was a violation of the securities laws; therefore, FDIC argues, they should not be liable. The real issue, however, is not whether the bank examiners could tell whether the bank's actions were illegal (or indeed whether the examiners knew what the law was), but rather, whether the factual predicate for the application of the law is established on the bank's books. For the § 12(1) claim, every fact that the plaintiff needs to prove is appropriately evidenced in the bank's records. That the plaintiff must prove certain facts from the books of the Washington Bancorporation or other entities to show that the commercial paper was a violation of § 12(1) is immaterial; under no circumstances can these facts be deemed part of an "agreement" involving the bank and AFSCME nor can *D'Oench* apply to them in any way.

**29.** Two courts have explicitly rejected such an expansion of *D'Oench*. *See Vernon v. RTC*, 907 F.2d 1101 (6th Cir.1990); *Agri Export Cooperative v. Universal Sav. Ass'n*, 767 F.Supp. 824 (S.D.Tex.1991).

**30.** Had the plaintiff agreed to purchase commercial paper which it knew was illegal, the court might reconsider its holding. Such an arrangement would be one in which the purchaser could

protect himself and the action would tend to deceive banking authorities. The FDIC should not be liable for an absurd risk taken by an investor.

**31.** *D'Oench* "is a rule of estoppel which ... create[s] an irrefutable presumption in favor of the FDIC that the documents in the records of the bank on the date of insolvency represent the true agreement between the parties." *RSR Properties, Inc. v. FDIC*, 706 F.Supp. 524, 531 (W.D.Tex.1989); *see also Bowen v. FDIC*, 915 F.2d 1013, 1016 (5th Cir.1990) ("transactions not reflected on the bank's books do not appear on the judicial radar screen either"). Even under these expansive interpretations of *D'Oench*, plaintiff's § 12(1) claim survives; the true agreement of the parties—the sale of commercial paper—is on the bank's books and the sale itself creates the potential liability.

**32.** Plaintiff rightly notes that the FDIC's interpretation of *D'Oench* would turn it from a doctrine which states "*if* you have a claim based on an agreement, the agreement has to have been recorded in the bank's records" to one which states that a party "can't bring a claim *unless* it is based on a written recorded agreement." Pl. Mem.Opp.Mot.Dis. at 27 (emphasis in original); *see also Vernon v. RTC*, 907 F.2d 1101, 1108 (11th Cir.1990) (rejecting such an expansion).

*D'Oench* may be harsh, but it is an equitable principle to help decide who should bear the cost—the FDIC or the party making the claim or defense.[33] When the equities are equal, i.e. when a party could have done nothing to protect itself, then *D'Oench* does not protect the FDIC. It is only when the party's failure to specify the terms of the agreement or the party's own affirmative acts that would mislead the bank examiners founds the claim or defense that the *D'Oench* doctrine bars their claim or defense. Similarly, § 1823(e) and § 1821(d)(9)(A) only bar a party's recovery or defense when the party asserts an agreement which does not fulfill the statute's requirements.

The FDIC states in its memorandum in support of its motion to dismiss that "[i]mposition of liability upon FDIC for NBW's violation of the registration provisions of the securities laws would not serve the disclosure or deterrent goals of Section 12(1), and would interfere with the goal of protecting the national banking system." Def.'s Mem.Supp. Mot.Dis. at 19. The court cannot agree with his statement at all. Expansion of the *D'Oench* doctrine to a case such as this may encourage banks on the verge of financial ruin to sell worthless commercial paper to support their bank; admittedly, officers of such banks may be personally liable for these sales, but the expansion of *D'Oench* could tip the scales for a banker whose only focus is attempting to minimize such losses. More importantly, *D'Oench* might create inappropriate incentives for *bank regulators*, whose client, the FDIC, would no longer have a stake in pressuring banks to cease sales of worthless commercial paper. *See In re Woodstone Ltd. Partnership*, 133 B.R. 678 (E.D.N.Y.1991) (describing the dangers to the national banking system of an expansive interpretation of *D'Oench* ). Thus, because the court finds that AFSCME's § 12(1) claim does not rely an agreement or "arrangement" within the meaning of the *D'Oench*

doctrine, the FDIC's motion to dismiss shall be denied with respect to Count I.

B. Count II—Violation of § 12(2) of the Securities Act of 1933

Count III—Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 Thereunder

Count V—False Representation

Count VI—Fraudulent Concealment

Count VII—Failure to Disclose

Count IX—Violation of District of Columbia Blue Sky Law

■ Plaintiff next alleges that officials of NBW misrepresented material facts and failed to disclose certain material facts on May 4, 1990, when AFSCME was considering purchasing commercial paper in the overnight market. Specifically, plaintiff allege that officials of NBW stated that an investment in commercial paper was as safe as the investments in government securities which AFSCME had previously engaged in; further, NBW officials never revealed that there were no supporting lines of credit for the commercial paper or that federal regulators had advised WBC and NBW to cease selling the commercial paper. The FDIC responds that *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), completely disposes of these claims and forbids any party from using a failed bank's alleged oral misrepresentations from being asserted against the FDIC. According to FDIC's interpretation of *Langley*, the term agreement should be construed "broadly to include all conditions and defenses." *FDIC v. Meyer*, 755 F.Supp. 10, 12 n. 3 (D.D.C.1991). Plaintiff replies that they are not asserting any agreement at all; rather, their case is focused on misrepresentations and omissions which are independent of an agreement.

---

**33.** In essence, *D'Oench* ignores the wrongdoing of the failed bank and its officials in its calculus. *D'Oench* weighs the bank customer's actions against the FDIC; because the FDIC enters the situation subsequent to the transaction which is the subject of the suit, it is not likely to have acted inequitably. Any conduct by the customer—such as not recording a misrepresentation—will tip the scales in favor of the FDIC. In many ways, *D'Oench* is analogous to the traditional contributory negligence doctrine, where parties are forbidden any recovery if their acts contributed to the incident in even the slightest way.

Because of the broad interpretation of the term "agreement" which *Langley* mandates and the court's holding that an "arrangement" under *D'Oench* is similarly broad, the court must agree with the FDIC that these claims, which depend on misrepresentations and material omissions must be dismissed. In *Langley*, the petitioner stated that he need not repay a loan on a piece of property which he had purchased from the bank because the bank had made material misrepresentations of fact. The Supreme Court treated these misrepresentations as warranties or conditions to performance on the contract for the purchase of land and the loan. *See id.* at 94, 108 S.Ct. at 402–03. Plaintiff's situation in this case is not dissimilar, despite the fact that plaintiff is an investor, not a borrower. Plaintiff accepted the representations of the bank as to the safety of the investment without recording the representation in a fashion that would make bank examiners aware; the only difference between this plaintiff and the plaintiff in *Langley* is that the plaintiff there was a borrower, a difference which this court rejects in the context of the *D'Oench* doctrine. This oral agreement would tend to mislead bank examiners because there was no record of any guarantee that plaintiff's money would be invested in low-risk securities. Bank examiners would only see an investment and have no documentation for this contingent liability. Further, plaintiff could have protected itself by getting such a guarantee in writing and insuring that this writing was part of the bank's books. This failure to get the guarantee in writing triggers the application of *D'Oench. See FDIC v. State Bank,* 893 F.2d 139 (7th Cir.1990); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091 (N.D.Tex.1990).

**34.** Even if, as AFSCME alleged in its memoranda and at oral argument, the duty derives not from any side agreement concerning the safety of the investments, but rather by operation of law, the court believes that the logic of *Langley*, as applied to the *D'Oench* doctrine, would bar the claims. Plaintiff alleges a sale and an omission, which they claim does not include an agreement. Yet, the sale itself is an agreement under *D'Oench*, and the alleged material omissions and misrepresentations are, as *Langley* indicates, conditions to performance on that sale. Thus, the plaintiff here is in exactly the same position as the plaintiff in *Langley*. In *Langley*, the sale

AFSCME argues that in no way can an omission be considered an "agreement." Plaintiff did not know the facts which NBW officials allegedly failed to tell them and thus could not have agreed or lent themselves to any arrangement that would tend to deceive bank examiners. The source, however, of NBW's duty to disclose appears to be an oral agreement not recorded in the bank's records. From the court's reading of AFSCME's complaint, these counts locate the duty in AFSCME's oral agreement with NBW concerning the relatively low-risk nature of AFSCME's investments.[34] Thus, the gravamen of the FDIC's defense is that AFSCME failed to get this agreement in writing. Because bank examiners could not have known about this duty which derived from an unrecorded agreement, the FDIC's motion to dismiss shall be granted with respect to these claims.

### C. Count IV—Breach of Fiduciary Duty

### Count VIII—Negligence

 AFSCME's complaint also states claims for breach of fiduciary duty (Count IV) and negligence (Count VI). AFSCME argues that these claims do not rest on agreements of any kind. The FDIC responds that they are simply attempts to recast plaintiff's misrepresentation claims. These claims, though distinct, raise similar issues as plaintiff's misrepresentation claims treated in the previous sections. Once again, the source of NBW's duty to investors is crucial. If the duty is based on an unwritten agreement, as plaintiff's misrepresentation-type claims are, then *D'Oench* applies.

The court, however, is not convinced that plaintiff's claim for breach of fiduciary duty

and loan were the agreement to which the misrepresentations were conditions to performance; in this case, the sale of commercial paper can be construed as the agreement (although the court does not read the complaint to allege this) and the misrepresentations and material omissions were conditions to performance. AFSCME states that they do not "contend that any duty of performance it has under an agreement with NBW is now excused" because of NBW's misrepresentations; this is not so—the duty they are seeking to escape is the duty to pay the purchase price for the commercial paper, however worthless it may be now.

is based on an unwritten agreement; plaintiff alleges a duty independent of any agreement concerning safe investment. *See Garrett v. Commonwealth Mtge. Corp.*, 938 F.2d 591, 594 (5th Cir.1991). If plaintiff can establish this independent duty, then the claim would not be connected to an agreement or an arrangement which would tend to deceive bank examiners.[35] The sale itself would be sufficient to create the bank's liability. The FDIC cites numerous cases in which courts have held that breach of fiduciary duty claims are barred by *D'Oench. See, e.g., Beighley v. FDIC*, 868 F.2d 776 (5th Cir. 1989); *Oliver v. RTC*, 747 F.Supp. 1351, 1352 (E.D.Mo.1990). Yet these cases forbid the assertion of a fiduciary duty claim when the fiduciary duty is itself based on the oral representations or agreements not recorded in the bank's records. Where the basis of the fiduciary relationship derives from a source other than an unwritten agreement, *D'Oench* does not apply. *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635 (D.N.J.1990). AFSCME's complaint locates the source of the duty in the relationship (broker/agent) between NBW and AFSCME, not in any statements made by NBW. Indeed, the essence of AFSCME's claim against its agent is self-dealing, which does not depend on any agreement or representation. Thus, at this time, the court cannot say that *D'Oench* bars Count IV of AFSCME's complaint. This result demonstrates how difficult it becomes to apply *D'Oench* outside the traditional borrower context. Any fiduciary relationship between a lender and a borrower would likely derive from some agreement of the parties or some representation made by one of the parties; thus *D'Oench*, or more likely § 1823(e) and § 1821(d)(9)(A), would often apply. In this context, however, where the relationship was allegedly that of investor and agent, NBW may have had a duty because of its role as investment broker for AFSCME.[36]

Plaintiff's negligence claim may similarly survive *D'Oench. See Garrett*, 938 F.2d at 594. Plaintiff's claim is that the bank violated a duty of care simply by investing in WBC commercial paper which it knew was worthless. This duty does not appear to derive from any unwritten agreement nor to depend on any material omissions or misrepresentations. AFSCME alleges that the fact of the sale itself was a breach of this duty of care. The court notes that *D'Oench* may be an appropriate defense to both of these claims if they require an unwritten agreement to establish them, but the court will not dismiss them at this time.

## VI. Other Defenses to AFSCME's § 12(1) Claim

### A. Preclusion

AFSCME in its opposition argues that the FDIC should not be permitted to raise any defenses which they did not cite in their letter of denial. Under FIRREA, the FDIC must notify a claimant within 180 days whether it will allow or disallow a claim. *See* 12 U.S.C. § 1821(d)(5)(A)(i) (1991). In its notice of disallowance, the FDIC must provide "a statement of each reason for the disallowance." 12 U.S.C. § 1821(d)(5)(A)(iv) (1991). Plaintiff once again argues for a strict construction of the statute to give teeth to the words "each reason." The FDIC argues that plaintiff's interpretation of the statute is unreasonable. If plaintiff's interpretation were correct, the FDIC would not be able to assert any defenses to claims to which they did not respond within the 180–day period.[37] Congress, however, foresaw this

---

**35.** The FDIC argues in summary fashion that a bank generally has no fiduciary duty to depositors to invest their money wisely. The court shall not, however, rule on the issue of a fiduciary duty to these plaintiffs at this time because neither party have briefed the issues in full.

**36.** The FDIC argues that a bank owes no general duty to a depositor concerning the safety of investments made with deposited funds. The FDIC did not cite any cases from this jurisdiction and the court will not decide this issue without

substantially more briefing by the parties. In addition, AFSCME's status as an investor, rather than an ordinary depositor, may make the cases cited by the FDIC inapposite.

**37.** In a sense, AFSCME's argument is not much different than that made by plaintiff International Association of Machinists and Aerospace Workers, who argue that, by not responding within the 180–days, the FDIC concedes the validity of its claim. The court rejects both plaintiffs' arguments.

possibility by permitting claimants to file a district court action if the FDIC neither allowed nor disallowed their claim. Congress clearly would not have created such a procedure had it intended that the FDIC could have no defense in these ·district court actions. Further, requiring the FDIC to seek out every possible reason for a denial could force the agency to divert scarce resources to this process, thereby undermining the streamlined administrative process which Congress intended to create. Thus, the court holds that § 1821(d)(5)(A)(iv) does not bar the FDIC from raising defenses other than those noted in letters of disallowance.

### B. Statute of Limitations

■ The FDIC alternatively argues that all of the plaintiffs failed to satisfy the statute of limitations applicable to their § 12(1) claims. Under § 13 of the 1933 Securities Act, a plaintiff must both file its action within one year after the violation upon which it is based and also within "three years after the security was bona fide offered to the public." 15 U.S.C. § 77m (1991). There is no dispute that AFSCME and the other plaintiffs have fulfilled the first prong of § 13, but the FDIC argues that WBC commercial paper was first offered to the public in 1984, and thus that AFSCME's suit, filed as an administrative claim on August 17, 1990, is time-barred. Plaintiff responds that this result is absurd, since WBC and NBW did not actually violate § 12(1) until April of 1990 when the supporting lines of credit were withdrawn. Thus, under the FDIC's theory, the statute of limitations would have run before the cause of action accrued and indeed before NBW ever violated § 12(1) as to any purchaser of commercial paper.

Despite the unusual result of FDIC's argument, the FDIC cites cases to support their proposition. *See, e.g., Waterman v. Alta Verde Indus., Inc.,* 643 F.Supp. 797 (E.D.N.C.1986), *aff'd,* 833 F.2d 1006 (1987); *Morley v. Cohen,* 610 F.Supp. 798 (D.Md. 1985); *LeCroy v. Dean Witter Reynolds, Inc.,* 585 F.Supp. 753 (E.D.Ark.1984).[38] The court finds none of these cases persuasive, and indeed, believes that they do not stand for the interpretation which the FDIC asks the court to espouse. None of these courts faced the situation at issue here, where a seller sold legal commercial paper for several years and then subsequently sold illegal commercial paper.[39] All of the other courts simply found that the three-year statute of limitations was an independent requirement from the one-year provision and that the plaintiffs in those cases had failed to file their actions within that three years. The logic behind these opinions suggests the rationale of the two statute of limitations. The one-year requirement, as any other statute of limitations, is designed to insure that purchasers of securities file their claims promptly. The three-year provision is "a trap for the unwary investor." *LeCroy,* 585 F.Supp. at 760. If an illegal security, such as one that is unregistered and not "prime," has been offered for three years, investors who do a little research should become aware of such problems. The three-year statutes of limitations places the risk on investors who do not sufficiently consider investments with a longstanding track record.

In the case of AFSCME, the three-year statute of limitations does not bar this action. Although WBC commercial paper of prime quality was first offered to the public in 1984, it was not until April of 1990 that the allegedly illegal commercial paper was offered for sale. These sales, made after the lines of

**38.** At least two of these courts expressed some concerns about the inequity of the statute of limitations. *See Waterman,* 643 F.Supp. at 808; *LeCroy,* 585 F.Supp. at 760.

**39.** The FDIC states that plaintiff in *Waterman v. Alta Verde Industries, Inc.,* ·643 F.Supp. 797 (E.D.N.C.1986), made the same argument as AFSCME does and quotes language from that opinion rejecting the argument. Plaintiffs in *Waterman,* however, although arguing that the same inequities would result from the defen-

dant's interpretation as AFSCME claims would result from the FDIC's interpretation, argued that the three-year statute of limitations should accrue when the paper was *last* offered to the public. There the court, although not pleased with the result, rejected plaintiff's interpretation which was clearly contrary to the plain meaning of the statute. AFSCME stands in a significantly different posture and asks the court to accept a much more plausible reading of the plain language of the statute.

back-up credit were withdrawn, constitute the offering of a different security for the purposes of § 13 and thus, the three-year statute of limitations began to run in April of 1990. Because AFSCME filed its administrative action in August of 1990, they have satisfied the requirements of § 13 and their claim is not time-barred.

### VII. FDIC's Motion to Strike

The FDIC moves to strike various of AFSCME's prayers for relief, including its claims for rescission, interest, attorney's fees, and punitive damages. The FDIC argues that under no circumstances, as a matter of law, are any of these types of relief available against the FDIC. AFSCME focuses its arguments on the high standard which a party must meet in order to win a motion to strike and reminds the court that it is a "drastic remedy." 5A Wright & Miller, Federal Practice and Procedure § 1380, at 647–49 (1990).

The FDIC's motion to strike AFSCME's claim for rescission presents a clash between two heavy burdens. The high hurdle engendered by a motion to strike is offset in this case by the heavy burden which a plaintiff must bear in order to overcome the preference for *pro rata* distribution which FIRREA and its predecessors embody. Plaintiff suggests a variety of scenarios where they might be able to obtain rescission and the FDIC demonstrates that these scenarios are unlikely and contrary to federal policy. Despite the court's belief that it is highly unlikely that AFSCME will be able to overcome the presumption favoring *pro rata* distribution, the court is unwilling to grant the motion to strike on the basis of a policy, as opposed to a more clear rule of law. Even the FDIC's citation of § 1821(i)(2), which establishes the maximum liability of the FDIC in its capacity as receiver, does not appear determinative of the issue. The court will await further development of the facts in this case before deciding the issue of rescission.

For similar reasons the court will deny the motion to strike with respect to interest. Interest generally is unavailable because it tends to undermine the preference for ratable distribution, but plaintiffs may recover interest under certain very specific circumstances, depending both on the outcome of the case and the actions taken by the FDIC as receiver for NBW in settling creditors' claims. The plaintiff notes that the receiver may have already paid out a substantial dividend to the creditors of NBW, to which AFSCME may someday be entitled— with interest. As for attorneys' fees, the court again notes that it is highly unlikely that AFSCME will be able to obtain attorneys' fees. Indeed, the only method by which AFSCME argues that they may have a claim for attorneys' fees appears to depend not on the outcome of this case, but rather on the conduct of the FDIC's attorneys. Under the Equal Access to Justice Act, plaintiff may recover attorneys' fees if the FDIC's counsel take a substantially unjustified position in this case. Although one court has permitted a plaintiff to maintain such a claim because of the provisions of the EAJA, *see Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1099 (N.D.Tex.1990), this court will grant the motion to strike with regard to attorneys' fees. If the FDIC takes a substantially unjustified position in this case, the court will permit the plaintiff to seek attorneys' fees at that time.

Plaintiff agrees that the FDIC is not be liable for punitive damages because Congress has not expressly authorized such liability and AFSCME has withdrawn its plea for punitive damages. The court notes that this position is in accord with all authorities. The FDIC's motion to strike the prayer for punitive damages shall be denied as moot.

### VIII. FDIC's Second Motion to Dismiss— The Supplemental Claims

On November 1, 1991, the FDIC moved to dismiss all of the claims in the other 20 commercial paper cases against the FDIC as receiver. The FDIC stands, more or less, on the arguments it raised in its motion to dismiss the AFSCME complaint. While most of the other plaintiffs adopt the memoranda filed by AFSCME's counsel, various plaintiffs have filed additional objections to FDIC's arguments in general and to the motion to dismiss as it relates to specific claims raised by their complaints. Because

most of the analysis is identical to that which the court performed concerning the motion to dismiss the AFSCME complaint, the court will deal with these claims in even more summary fashion.

### A. Misrepresentation-type Claims

■ For the reasons discussed in Part V(B) of the court's opinion above, all claims styled as fraud, deceit, false representation, fraudulent misrepresentation, fraudulent concealment, failure to disclose, negligent misrepresentation,[40] violation of § 12(2) of the 1933 Securities Act, violation of § 10(b) of the 1934 Securities Exchange Act, or violation of the District of Columbia's Blue Sky Law [41] shall be dismissed as barred by the *D'Oench* doctrine.

### B. Violations of § 12(1) of the 1933 Securities Act

For the reasons discussed in Part V(A) of the court's opinion above, the motion to dismiss plaintiffs' § 12(1) claims shall be denied.

### C. Breach of Fiduciary Duty and Negligence

For the reasons discussed in Part V(C) of the court's opinion above, the motion to dismiss plaintiffs' breach of fiduciary duty and negligence claims shall be denied.[42]

### D. Conversion

■ Certain plaintiffs allege the tort of conversion. The basis of the claim is that NBW, as a subsidiary of WBC, the issuer of the commercial paper, essentially exercised dominion over these plaintiffs' deposits by purchasing worthless commercial paper. In essence, they allege that the commercial paper sale was a sham and that their money was simply stolen. The factual predicate of this claim is fundamentally different than that for claims of fraud or misrepresentation. Plaintiffs may need to prove an agreement to win on this claim: the illegal exercise of dominion over their money may have be based on an agreement that the funds would be used in a certain way; if so, *D'Oench* may bar these claims. Nonetheless, conversion may be proven without reference to an agreement at all. Thus, the court will not dismiss the plaintiffs' conversion claims at this time.

### E. Breach of Contract

Several plaintiffs [43] allege a written agreement as the basis for a breach of contract claim. They claim that their Master Repurchase Agreement defines the terms of their contractual relationship and that NBW's purchase of commercial paper was a breach of this contract. The FDIC argues that the Repurchase Agreement has no connection to the purchases of WBC commercial paper, which were made pursuant to a separate course of dealing to which these plaintiffs acceded. Each side submits documents to support their claim and invites the court to transform the motion into a Rule 56 motion for judgment as a matter of law.

■ The court will decline the opportunity to turn this motion into a Rule 56 motion. Neither party has fully presented their evidence in a form appropriate for a disposition under Rule 56. Further, the factual issues raised by each side indicate that

---

**40.** The FDIC suggests that negligent misrepresentation claims are analytically similar to claims of negligence. At this time, the court does not believe that this is correct. The two types of claims are similar as to the required state of mind, but unrecorded misrepresentations are barred by *D'Oench*, whereas other types of negligence may not be.

**41.** Plaintiff T.J.B., Inc. (C.A. No. 91–1704) alleges violations of unspecified provisions of the Virginia Blue Sky law. Because the court cannot determine what provisions of the law the plaintiff is relying on, the court will await further clarification of this claim before deciding if it should be dismissed.

**42.** Plaintiff Columbia Real Estate & Title Insurance Co. (C.A. No. 90–1702) alleges a separate breach of fiduciary duty claim arising out of statements made by an officer of NBW. Because this claim appears to be based on misrepresentations, it is barred by *D'Oench* and shall be dismissed.

**43.** These plaintiffs include The George Hyman Construction Co. and Hyman–Stubbins, Inc., Civil Action No. 90–1297; Ward Corp., Civil Action 90–1810; and International Association of Machinists and Aerospace Workers, Civil Action No. 90–1822.

these claims may not be appropriately disposed of on a motion to dismiss. The FDIC alleges that these plaintiffs acquiesced to an unwritten agreement involving the purchase of WBC commercial paper through their acceptance of confirmation slips. The court cannot resolve this issue as a matter of law at this time. Thus, the FDIC's motion to dismiss these plaintiffs' breach of contract claim shall be denied.[44]

### F. Prayers for Relief

For the reasons stated above in Part VII of the court's opinion, the FDIC's motion to strike with regard to punitive damages and attorneys' fees shall be granted, while the FDIC's motion to strike interest and rescission shall be denied. In addition, the FDIC's motion to strike plaintiffs' claims for a constructive trust shall be denied for reasons that the court discusses above concerning the availability of rescission.

### IX. Conclusion

The court is not ignorant of the unusual results which the *D'Oench* doctrine generates, nor is the court enamored of them. *D'Oench* creates a mine field for plaintiffs. It may seem odd that plaintiffs may recover on some claims but not others, even though these other claims appear to involve more heinous conduct on the part of the failed bank's officials. Yet the combination of *D'Oench* and the structure of the tort system insures that plaintiffs who have not violated the equitable tenets of the doctrine can recover under some theory. Further, this regime is not one that simply rewards artful pleading. *D'Oench* tells bank customers that they should not rely on anything (agreement, representation, or unstated assumption) that is not recorded in the bank's records. They probably will be unable to recover if they assert anything that was said orally or on which they relied, yet failed to have recorded. *D'Oench* places the blame, however, slight, on the customer and relieves the FDIC of responsibility. If, however, the bank violates the law and creates liability that is unconnected to an unrecorded agreement with or representation to the customer, then the FDIC and the customer stand in the same position; the customer could have done nothing to protect himself and the factual predicate for the claim is on the books for a bank examiner. In these situations, where the equities are equal, *D'Oench* relents.

For the foregoing reasons, the FDIC's motion to dismiss the AFSCME complaint shall be GRANTED in part and DENIED in part and FDIC's motion to dismiss the supplemental counts shall be GRANTED in part and DENIED in part in a separate order filed on this date.

### ORDER

Upon consideration of the memoranda submitted by counsel, the record herein, and the arguments made in open court, and for the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that the FDIC's motion to dismiss and/or strike prayers for relief in *AFSCME v. FDIC,* C.A. No. 91–626, is GRANTED in part and DENIED in part as follows:

1. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 7, and 9 of the complaint in *AFSCME v. FDIC,* C.A. No. 91–626. The motion to dismiss is DENIED with respect to Counts 1, 4, and 8.

---

44. Telemet America, Corp. (No. 90–1753) alleges the existence of a written contract based on a letter send by Telemet to NBW authorizing a Telemet employee to make only certain kinds of investments. The court does not believe that Telemet can meet any writing requirement under *D'Oench* since some additional oral understanding would have to be plead for Telemet to establish its contract. Thus, the motion to dismiss Telemet's breach of contract claim shall be granted. Kaempfer Co. (C.A. No. 90–1696) and Thomas Dodd (C.A. No. 90–1875) also allege breach of contract claims. Neither alleges the existence of a written contract, but each seeks discovery to see if there is anything in NBW's files that might suffice. Because they cannot in good faith assert the existence of such an agreement and because customers bear some burden for maintaining the records of their transactions, the court will not permit discovery on this issue and these plaintiffs breach of contract claims shall be dismissed. In addition, the motion to dismiss shall be granted with respect to the breach of contract claims of plaintiffs National Theater Corp. (C.A. No. 90–1837) and World Plan Executive Council (C.A. No. 90–1841), which appear to be based solely on oral agreements.

2. The motion to strike is GRANTED with respect to plaintiff's prayer for attorneys' fees. The motion to strike as to punitive damages is DENIED as moot because plaintiff has withdrawn this prayer for relief. The motion to strike is DENIED as to the prayers for rescission and interest.

It is further ORDERED that the FDIC's motion to dismiss and/or strike prayers for relief in the remaining cases is hereby GRANTED in part and DENIED in part as follows:

1. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6 and 9 of the complaint in *George Hyman Constr. Co. v. FDIC*, C.A. No. 90–1297. The motion to dismiss is DENIED with respect to Counts 1, 4, 7, 8 and 10. The motion to strike is GRANTED with respect to punitive damages and attorneys fees. The motion to strike is DENIED with respect to interest and rescission.

2. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 8, 9, 11 and of the complaint in *Kaempfer Co. v. FDIC*, C.A. No. 90–1696. The motion to dismiss is DENIED with respect to Counts 1, 4, 7 and 12. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest, rescission, and imposition of a constructive trust.

3. The motion to dismiss is GRANTED with respect to Counts 2, 6, 7 and 8 of the complaint in *Columbia Real Estate Title Insur. Co. v. FDIC*, C.A. No. 90–1702. The motion to dismiss is DENIED with respect to Counts 3 and 4. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

4. The motion to dismiss is GRANTED with respect to Counts 1, 3, 5 and 6 of the complaint in *Telemet America, Inc. v. FDIC*, C.A. No. 90–1753. The motion to dismiss is DENIED with respect to Counts 2 and 4. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

5. The motion to dismiss is GRANTED with respect to Counts 1, 2, 5, 7 and 9 of the complaint in *Route 35 Shrewsbury v. FDIC*, C.A. No. 90–1766. The motion to dismiss is DENIED with respect to Counts 3, 4, 6 and 8. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

6. The motion to dismiss is GRANTED with respect to Counts 4, 5, 7, 9 and 10 of the complaint in *Sherman R. Smoot Corp. v. FDIC*, C.A. No. 90–1795. The motion to dismiss is DENIED with respect to Counts 3, 6 and 8. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

7. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 8, 11, 12, 13 and 14 of the complaint in *Ward Corp. v. FDIC*, C.A. No. 90–1810. The motion to dismiss is DENIED with respect to Counts 1, 4, 7, 9 and 10. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

8. The motion to dismiss is GRANTED with respect to Counts 2, 4, 5 and 6 of the complaint in *International Ass'n of Machinists & Aerospace Workers v. FDIC*, C.A. No. 90–1822. The motion to dismiss is DENIED with respect to Counts 1 and 3. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

9. The motion to dismiss is GRANTED with respect to Counts 1, 3, 4, 5 and 6 of the complaint in *National Theatre Corp. v. FDIC*, C.A. No. 90–1837. The motion to dismiss is DENIED with respect to Counts 2 and 8. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

10. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 8, 9 and 11 of the complaint in *World Plan Executive Council v. FDIC*, C.A. No. 90–1837. The

motion to dismiss is DENIED with respect to Counts 1, 4, 7 and 10. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

11. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6 and 9 of the complaint in *Clarendon Square Assoc. v. FDIC*, C.A. No. 90–1874. The motion to dismiss is DENIED with respect to Counts 1, 4 and 7. The motion to strike is GRANTED with respect to attorneys' fees. The motion to strike is DENIED with respect to interest, rescission and imposition of a constructive trust.

12. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 8, 9 and 10 of the complaint in *Thomas Dodd v. FDIC*, C.A. No. 90–1875. The motion to dismiss is DENIED with respect to Count 1, 4, 7 and 11. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

13. The motion to dismiss is GRANTED with respect to Counts 1, 2 and 4 of the complaint in *Bresler & Reiner v. FDIC*, C.A. No. 90–3017. The motion to dismiss is DENIED with respect to Counts 3 and 5. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

14. The motion to dismiss is GRANTED with respect to Counts 1, 3, 5 and 6 of the complaint in *Richard J. Barber Assoc. v. FDIC*, C.A. No. 90–3089. The motion to dismiss is DENIED with respect to Counts 2 and 4. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest.

15. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, and 9 of the complaint in *Scowcroft v. FDIC*, C.A. No. 91–0996. The motion to dismiss is DENIED with respect to Counts 1, 4, 7 and 8. The motion to strike is GRANTED with respect to attorneys' fees. The motion to strike is DENIED with respect to interest, rescission and imposition of a constructive trust.

16. The motion to dismiss is GRANTED with respect to Counts 1, 2, 5, 7 and 9 of the complaint in *Clinton & Co. v. FDIC*, C.A. No. 91–0997. The motion to dismiss is DENIED with respect to Counts 3, 4, 6 and 8. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission. ·

17. The motion to dismiss is GRANTED with respect to Counts 2, 3, 5, 6, 7 and 9 of the complaint in *T.J.B., Inc. v. FDIC*, C.A. No. 91–1704. The motion to dismiss is DENIED with respect to Counts 1, 4, 8 and 10. The motion to strike is GRANTED with respect to attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

18. The motion to dismiss is GRANTED with respect to Counts 3, 5, 6, 7, 9 and 10 of the complaint in *Stein v. FDIC*, C.A. No. 91–1706. The motion to dismiss is DENIED with respect to Counts 1, 2, 4 and 8. The motion to strike is GRANTED with respect to punitive damages and attorneys' fees. The motion to strike is DENIED with respect to interest and rescission.

19. The motion to dismiss is GRANTED with respect to Counts 2, 3, 6, 7 and 9 of the complaint in *Bafton Corp. v. FDIC*, C.A. No. 91–1838. The motion to dismiss is DENIED with respect to Counts 1, 4, 5 and 8. The motion to strike is DENIED with respect to interest, rescission and imposition of a constructive trust.

20. The motion to dismiss is GRANTED with respect to Counts 2, 3, 6, 7 and 9 of the complaint in *Colson Servs. Corp. v. FDIC*, C.A. No. 91–1839. The motion to dismiss is DENIED with respect to Counts 1, 4, 5 and 8. The motion to strike is DENIED with respect to interest, rescission and imposition of a constructive trust.

SO ORDERED.